# In the Iowa Supreme Court

No. 23–1766

Submitted December 18, 2024—Filed June 27, 2025

**Eugene Sikora,**

Appellant,

vs.

**State of Iowa** and **Beth Skinner,** in her official capacity as Director of the Iowa Department of Corrections,

Appellees.

Appeal from the Iowa District Court for Polk County, Joseph Seidlin, judge.

A former prisoner appeals the dismissal of his tort damages suit for wrongful imprisonment. **Affirmed.**

May, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman and Mansfield, JJ., joined. Mansfield, J., filed a concurring opinion, in which Christensen, C.J., and Waterman, J., joined. McDonald, J., filed a dissenting opinion, in which Oxley and McDermott, JJ., joined. Oxley, J., filed a dissenting opinion, in which McDonald and McDermott, JJ., joined. McDermott, J., filed a dissenting opinion, in which McDonald and Oxley, JJ., joined.

Jack Bjornstad (argued) of Jack Bjornstad Law Office, Spirit Lake, for appellant.

Brenna Bird, Attorney General; Eric Wessan, Solicitor General; Patrick C. Valencia, Deputy Solicitor General; Nicholas Kilburg (argued), Assistant Attorney

General; and Tessa M. Register (until withdrawal), Assistant Solicitor General, for appellees.

**May, Justice.**

Eugene Sikora claims that the State of Iowa failed to release him from prison when his sentence was over. Three years after he was released, Sikora brought this suit alleging state-law tort claims against the State and the director of the Iowa Department of Corrections. All of Sikora's claims arise from his alleged wrongful imprisonment. As relief, Sikora seeks money damages.

The district court dismissed Sikora's suit. This appeal followed.

We conclude that the district court acted correctly. Under the doctrine of sovereign immunity, the state and its employees are generally immune from state-law tort claims for money damages arising from wrongful imprisonment. No exception applies here. So Sikora's suit cannot proceed. We affirm.

**I. Background.**

**A. Facts Alleged.** On May 6, 2016, Sikora was convicted of three felonies, one in each of three different cases. In each case, the court sentenced Sikora to a term of incarceration not to exceed five years, ordered the sentence to run concurrently with Sikora's other two cases, suspended the sentence, and ordered probation.

In 2017, Sikora's probation was revoked in all three cases. Sikora entered prison on May 4, 2017. He was released on March 19, 2019.

Sikora claims that his release was late because of a miscalculation. He claims that—in addition to his time in prison—he also served 292 days in county jails and a custodial residential center "in connection with" his three criminal cases. According to Sikora, the defendants did not give appropriate credit for this time. Sikora claims that this caused him to be imprisoned for nearly five months more than the law allowed.

**B. This Suit.** Over three years after he was released, Sikora brought this wrongful imprisonment suit for money damages. Sikora named the State of Iowa and the director for the Iowa Department of Corrections as defendants. Sikora asserted five tort claims: (1) violation of his right to due process under article I, section 9 of the Iowa Constitution; (2) violation of his right to freedom, liberty, and happiness under article I, section 1 of the Iowa Constitution; (3) violation of his right to be free from unreasonable seizure under article I, section 8 of the Iowa Constitution; (4) negligence; and (5) negligence per se. Sikora's claims under the Iowa Constitution (1, 2, and 3) are referred to as "*Godfrey* claims." This is a reference to our 2017 *Godfrey v. State* decision, in which four justices recognized certain tort claims under the Iowa Constitution. 898 N.W.2d 844, 871–72 (plurality opinion), 880 (Cady, C.J., concurring in part and dissenting in part) (Iowa 2017), *overruled by*, *Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023).

The defendants moved to dismiss Sikora's suit on three grounds: (1) all of Sikora's claims are essentially false imprisonment claims, which are barred by sovereign immunity; (2) *Godfrey* claims under article I, sections 1 and 8 are not cognizable; and (3) the defendants are entitled to qualified immunity under Iowa Code section 669.14A (2022). The defendants also argued that section 669.5(2) precluded any claims against the director in her personal capacity.

The district court granted the defendants' motion in part and denied it in part. The district court agreed with the defendants that Sikora's negligence and negligence per se claims were barred by sovereign immunity. And the court agreed that no authority permitted Sikora's claim under article I, section 1 to proceed. So the court dismissed those claims. In addition, the court dismissed all claims against the director in her personal capacity.

But the court declined to dismiss Sikora's claims under article I, section 9 and article I, section 8. In the court's view, those claims found support in our *Godfrey* decision.

The court's motion-to-dismiss ruling was entered in January 2023. Four months later, in May 2023, this court decided *Burnett v. Smith*, 990 N.W.2d at 307. *Burnett* overruled *Godfrey*. *Burnett*, 990 N.W.2d at 307.

The day *Burnett* was filed, the defendants moved for judgment on the pleadings. The defendants argued that because Sikora's two remaining claims were based on *Godfrey*, and because *Godrey* had been overruled, Sikora's remaining claims should be dismissed.

Sikora resisted. He argued that *Burnett*'s overturning of *Godfrey* could only operate prospectively. It could not operate retrospectively to bar his claims, which were filed prior to *Burnett*.

Sikora also moved to file a second amended petition. Through his proposed new pleading, Sikora sought to add three new defendants: two additional directors of the Iowa Department of Corrections, plus a bond company, Travelers Casualty & Surety Company of America. Sikora also sought to add new claims for false imprisonment, trespass on the case, and an action on the director defendants' official bonds.

The district court denied Sikora's motion to amend and granted the defendants' motion for judgment on the pleadings. The court agreed with the defendants that Sikora's remaining *Godfrey* claims could not survive in light of *Burnett* and subsequent opinions applying *Burnett* retroactively. And the court believed that Sikora's proposed new claims would be futile and, therefore, should not be allowed to proceed. This left Sikora with no viable claims. So the court dismissed the case in full.

Sikora now appeals.

**II. Analysis.**

Because we believe sovereign immunity dictates the proper outcome in this appeal, we begin with some background about that doctrine.

**A. Sovereign Immunity.** From the time of Iowa's founding, our law has recognized the doctrine of sovereign immunity. *See Terrace Hill Soc'y Found. v. Terrace Hill Comm'n*, 6 N.W.3d 290, 294 (Iowa 2024) ("As early as 1855, this court applied the common law doctrine of sovereign immunity."); *see also, e.g., Metz v. Soule, Kretsinger & Co.*, 40 Iowa 236, 240 (1875) (stating that a state penitentiary inmate harmed by negligent construction of the facility "could not have maintained an action against the State on account of his injuries"). Sovereign immunity generally precludes money damages claims against the state. *Wagner v. State*, 952 N.W.2d 843, 856 (Iowa 2020). Our cases show that the same was generally true with respect to money damages claims against "state employees acting within the scope of their employment," *id.*, although there were some outliers.[1]

In any event, things changed in 1965. That year, our legislature passed the Iowa Tort Claims Act (ITCA). 1965 Iowa Acts ch. 79 (originally codified at Iowa Code ch. 25A (1966), now codified as amended at Iowa Code ch. 669 (2022)). Through the ITCA, our legislature partially waived sovereign immunity. Iowa Code § 669.4(3) ("The immunity of the state from suit and liability is waived *to the extent provided in this chapter.*" (emphasis added)).

We emphasize the *partial* nature of the waiver. *Hubbard v. State*, 163 N.W.2d 904, 912 (Iowa 1969) ("Under the Act, the State is liable as [an] individual

---

[1]More on this below.

only in the manner and to the extent to which it has consented."). Even after the ITCA's enactment, immunity "remains the rule rather than the exception." *Wagner*, 952 N.W.2d at 856 (quoting *Lloyd v. State*, 251 N.W.2d 551, 555 (Iowa 1977)). The state and its employees "may now be sued in tort, but only in the manner and to the extent to which consent has been given by the legislature." *Swanger v. State*, 445 N.W.2d 344, 346 (Iowa 1989); *see also Segura v. State*, 889 N.W.2d 215, 221 (Iowa 2017) ("By enacting the ITCA, the State waived this immunity and opened itself to suit, but it did so strictly on its terms."). "This reality warrants respect for the statutory parameters marked-out by the legislature in creating" the ITCA. *Trobaugh v. Sondag*, 668 N.W.2d 577, 580 (Iowa 2003).

**B. Application.** With this background, we now turn to the ITCA's specific provisions and their application here. Under Iowa Code section 669.4(3), the state has waived immunity to the extent provided in chapter 669. But this waiver does not apply to any of the claims described in section 669.14, which is entitled "Exceptions." *Id.* § 669.14. Rather, the state is immune from any claim described in section 669.14. *Id.* Likewise, under section 669.23, that same immunity applies to the state's employees. *Id.* § 669.23 ("Employees of the state are not personally liable for any claim which is exempted under section 669.14.").

The main question here, then, is whether Sikora's claims fall into one of section 669.14's exceptions. The answer is yes. Section 669.14(4) prohibits suits for "[a]ny claim *arising out* of assault, battery, *false imprisonment*, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* § 669.14(4) (emphasis added). We emphasize the phrase "arising out of." *Id.* It means that we look at the substance of the plaintiff's grievance—"the type of wrong inflicted"—not the

manner of pleading. *Minor v. State*, 819 N.W.2d 383, 406 (Iowa 2012) (quoting *Greene v. Friend of the Ct.*, 406 N.W.2d 433, 436 (Iowa 1987)). "[W]here the basis of the plaintiff's claim is the functional equivalent of a cause of action listed in section 669.14(4), the government official is immune," as is the state. *Id.*

All of Sikora's claims are about the same alleged wrong: his overlong detention in prison. These claims are functional equivalents of false imprisonment, a claim listed in section 669.14(4). So all of Sikora's claims are barred.[2]

**C. Sikora's Counterarguments.** We have considered all of Sikora's counterarguments. We mention four of them: (1) his constitutional tort theory, (2) his idea that immunity can't extend to claims against individual officers, (3) his trespass on the case theory, and (4) his theory that section 64.18 permits a way around the ITCA. We also address Sikora's larger theme that fundamental fairness requires some relief for those wrongfully detained.

1. *Constitutional torts.* Sikora's constitutional theory is at the center of his appeal. His theory starts with the (noncontroversial) premise that wrongful imprisonment by the state and its employees is a violation of his rights under the Iowa Constitution. Sikora then reasons that because "constitutional rights serve to restrict government conduct, such rights would be meaningless if the state could rely on a defense of sovereign immunity" to avoid money damages suits. From this, Sikora concludes that sovereign immunity cannot prohibit money damages suits like his.

---

[2]Although the caption of Sikora's proposed petition lists the director defendants in their official and individual capacities, all of Sikora's allegations concern the acts or omissions of the director defendants acting within the scope of their employment. *See* Iowa Code §§ 669.2(3), .5(2). And so Sikora's individual capacity claims cannot proceed, either.

We disagree. It's true that in our 2017 *Godfrey* decision, we held "that under certain circumstances, an aggrieved party could bring a constitutional claim" for money damages against state defendants "even though the legislature had not enacted a damages remedy for violation of that constitutional provision." *Wagner*, 952 N.W.2d at 857 (discussing *Godfrey*, 898 N.W.2d at 871–72). And although *Godfrey* did not really discuss sovereign immunity, its recognition of *constitutional* torts suggested that sovereign immunity—under the common law or as modified by the ITCA—could not foreclose damages claims against state defendants. *Id.* at 858; *see also Godfrey*, 898 N.W.2d at 871–72 (plurality opinion), 880 (Cady, C.J., concurring in part and dissenting in part). Thus, the reasoning of *Godfrey* lines up well with Sikora's argument that because the constitution is supreme, his damages claims can't be blocked.

But then in 2023, all seven of our justices joined the *Burnett* opinion. *Burnett* "overrule[d] *Godfrey*" and "restore[d] the law as it existed in this state before 2017." *Burnett*, 990 N.W.2d at 291. We gave several reasons for this, not all of which need to be repeated here. But one of *Burnett*'s central concerns was *Godfrey*'s incompatibility with sovereign immunity, "a background principle" of Iowa law that was recognized by our constitutional framers during the 1857 debates. *Id.* at 300–01. This did not mean, of course, that Iowa courts were "powerless . . . to enforce the constitution" prior to our 2017 *Godfrey* decision. *Id.* at 301. Rather, the constitution was enforced primarily through *equitable* relief such as declaratory judgments or quo warranto actions. *See id.*; *see also, e.g.*, *State ex rel. Fenton v. Downing*, 155 N.W.2d 517, 520 (Iowa 1968) ("Where the purpose of the suit is to require the officers and agents of the State to perform their duties, there is no immunity recognized."). All the same: before 2017, Iowa courts "simply could not award damages" for constitutional violations without

the state's waiver of sovereign immunity. *Burnett*, 990 N.W.2d at 301. And, as mentioned, *Burnett* restored our law to its pre-2017 status. *Id.* at 291.

Under the pre-2017/post-*Burnett* law, Sikora's constitutional damages claims are not viable. So the district court was correct to dismiss Sikora's suit.

2. *Individual state employees.* Sikora counters that even if the state may assert sovereign immunity, individual state employees cannot. And so, Sikora suggests, his suit should proceed against the various Iowa Department of Corrections directors whom he named as defendants.

We disagree for two reasons. First, we have repeatedly recognized that sovereign immunity precludes "tort damage claims against the State *and state employees* acting within the scope of their employment." *Wagner*, 952 N.W.2d at 856 (emphasis added); *see also Trobaugh*, 668 N.W.2d at 584–85 (analyzing whether a claim of legal malpractice against a state employee assistant public defender is the functional equivalent of a cause of action listed in what is now section 669.14(4)); *Hawkeye By–Prods., Inc. v. State*, 419 N.W.2d 410, 410–12 (Iowa 1988) (en banc) (affirming the district court's dismissal of a misrepresentation claim against the state and an employee of the Iowa Department of Agriculture because of sovereign immunity and citing what is now section 669.14(4)); *Iowa Elec. Co. v. State Bd. of Control*, 266 N.W. 543, 544 (Iowa 1936) ("The doctrine that a state cannot be sued in its sovereign capacity is so well settled that it requires neither discussion nor citation of authorities. The difficulty is in determining whether the things of which complaint is made in the petition were done by the appellants in their capacity as officers of and as an agency of the state, and under the authority possessed by them as such officers and agency."); *De Votie v. Iowa State Fair Bd.*, 249 N.W. 429, 429 (Iowa 1933) (noting an agency of the state is not suable for damages); *Wilson v. La. Purchase*

*Exposition Comm'n*, 110 N.W. 1045, 1046 (Iowa 1907) ("It is fundamental that a state cannot be sued in its own courts without its consent, and it is a further rule that a litigant will not be permitted to evade the general rule by bringing action against the servants or agents of the state to enforce satisfaction for claims."); *Hatcher v. Dunn*, 71 N.W. 343, 344 (Iowa 1897) (holding the liability, if any, of a state oil inspector and his deputy for malfeasance could be statutory only).

Of course, as suggested above, constitutional claims for *equitable relief* can be brought against the state *and its employees. See, e.g.*, *Collins v. State Bd. of Soc. Welfare*, 81 N.W.2d 4, 6–7 (Iowa 1957) (action for a declaratory judgment that state welfare payments were unlawfully discriminatory in violation of article I, section 6); *Hoover v. Iowa State Highway Comm'n*, 222 N.W. 438, 438–40 (Iowa 1928) (permitting an action to enjoin the chief state highway engineer and state highway commissioners from constructing a road through the plaintiff's property). But this does not mean that *money damages* claims are allowed against state officials.

Similarly, although the common law sometimes allowed tort claims for money damages against *local* officials,[3] Sikora has cited no pre-ITCA cases

---

[3]We note that the Iowa Municipal Tort Claims Act (IMTCA) was enacted in 1967. 1967 Iowa Acts ch. 405 (originally codified at Iowa Code ch. 613A (1971), now codified as amended at Iowa Code ch. 670 (2022)). With limited exceptions, IMTCA imposes tort liability on municipalities and municipal officers and employees acting within the scope of their employment. Iowa Code §§ 670.2, .12.

Prior to the ITCA and the IMTCA, the state had sovereign immunity but local entities had much more limited immunity that often depended on whether they were performing a governmental function or not. *See, e.g.*, *Gorman v. Adams*, 143 N.W.2d 648, 651–53 (Iowa 1966) (holding governmental immunity did not apply to a city in a negligence action alleging failure to maintain a traffic light); *Sparks v. City of Pella*, 137 N.W.2d 909, 910–11 (Iowa 1965) (discussing an allegation that a city created a nuisance in the construction and maintenance of a sewer and noting that governmental immunity does not apply where the governmental agency created and maintained the nuisance); *Lindstrom v. Mason City*, 126 N.W.2d 292, 293, 296–97 (Iowa 1964) (involving a negligence action against a city for construction and maintenance of garden steps adjacent to a city library building, and stating that "damage actions against a city frequently

allowing tort claims for money damages against *state* officials. *See Burnett*, 990 N.W.2d at 299–300 (collecting cases); *Lennette v. State*, 975 N.W.2d 380, 406–08 (Iowa 2022) (McDonald, J., concurring) (collecting cases); *Norton v. Mathers*, 271 N.W. 321, 321 (Iowa 1937) (action for false arrest and false imprisonment against a county sheriff); *McClurg v. Brenton*, 98 N.W. 881, 881–83 (Iowa 1904) (action for trespass against a mayor and city police officers); *Chambers v. Oehler*, 77 N.W. 853, 854–55 (Iowa 1899) (action for false imprisonment against a county justice of the peace and deputized constables); *Bradley v. Miller*, 69 N.W. 426, 426–27 (Iowa 1896) (action for conversion against a sheriff); *Yount v. Carney*, 60 N.W. 114, 115 (Iowa 1894) (action for false arrest against a city marshal); *Morgan v. Zenor*, 55 N.W. 197, 197–98 (Iowa 1893) (involving an allegation that a sheriff wrongfully detained personal property); *Carpenter v. Scott*, 53 N.W. 328, 329 (Iowa 1892) (action for conversion against a constable); *Holmes v. Blyler*, 45 N.W. 756, 756 (Iowa 1890) (action for false imprisonment against a township constable); *Wert v. Potts*, 41 N.W. 374, 374–75 (Iowa 1889) (action against a township constable for an injury acquired during an arrest of a third party); *State v. Ward*, 36 N.W. 765, 767 (Iowa 1888) (suggesting a constable may have committed a trespass); *Clancy v. Kenworthy*, 35 N.W. 427, 428 (Iowa 1887) (action against a constable involving false imprisonment, excessive force, and malicious prosecution); *Arneson v. Thorstad*, 33 N.W. 607, 608 (Iowa 1887) (action for false imprisonment against a constable); *Montgomery v. Sutton*, 25 N.W. 748, 748 (Iowa 1885) (action against a city marshal for false imprisonment and malicious prosecution); *Lanpher v. Dewell*, 9 N.W. 101, 101–02 (Iowa 1881)

---

involve the distinction between governmental and proprietary duties"); *Florey v. City of Burlington*, 73 N.W.2d 770, 772 (Iowa 1955) ("The [governmental] immunity doctrine . . . is not complete immunity from judicial accountability such as is accorded the state—only freedom from the rule of respondeat superior where the servant is engaged in governmental activity.").

(action against a justice of the peace involving false imprisonment); *Tieman v. Haw*, 49 Iowa 312, 315–16 (1878) (action against a county's acting sheriff involving trespass and negligence); *Green v. Talbot*, 36 Iowa 499, 500 (1873) (action for false imprisonment against a town mayor); *Mayo v. Sample*, 18 Iowa 306, 310–12 (1865) (concluding a city police chief's allegedly slanderous statements were privileged); *Strunk v. Ocheltree*, 11 Iowa 158, 158–60 (1860) (action against a county constable for levying and selling a mare); *Plummer v. Harbut*, 5 Clarke 308, 312–14 (Iowa 1857) (action for trespass against a county constable); *Hutchinson v. Sangster*, 4 Greene 340, 340–41 (Iowa 1854) (action for trespass and false imprisonment against a city marshal); *Deforest v. Swan*, 4 Greene 357, 357 (Iowa 1854) (action for trespass against a county sheriff); *Hetfield v. Towsley*, 3 Greene 584, 584–85 (Iowa 1852) (action against a justice of the peace for alleged wrongful taking of oxen); *see also Girard v. Anderson*, 257 N.W. 400–01 (Iowa 1934) (involving private parties); *Krehbiel v. Henkle*, 121 N.W. 378, 379–80 (Iowa 1909) (same); *Allen v. Leonard*, 28 Iowa 529, 530–31 (1870) (same); *State v. Ross*, 21 Iowa 467, 471 (1866) (analyzing an interstate extradition and not mentioning a claim against a state official).

While Sikora suggests that early Iowa courts allowed damages actions for constitutional violations, we do not think his cases support a damages claim against state officials without statutory authorization. *See, e.g.*, *Lane v. Mitchell*, 133 N.W. 381, 382–83 (Iowa 1911) (damages claim against election judges who refused to give the plaintiff a ballot in violation of a voting statute, "section 1115 of the Code"); *see also Long v. Long*, 10 N.W. 875, 875–76 (Iowa 1881) (damages claim against an election judge for refusal to administer an oath in violation of a voting statute, section 620 of the 1873 Code); *Vanderpoel v. O'Hanlon*, 5 N.W. 119, 119–21 (Iowa 1880) (apparent damages claim against election judges for

deprivation of the constitutional right to vote, but reversing the plaintiff's verdict and not addressing whether damages are recoverable); *Burdick v. Babcock*, 31 Iowa 562, 564–70 (1871) (damages claim against independent school district officials alleging wrongful suspensions of two students and alleging the school district's rule was unreasonable, but involving no alleged constitutional violation); *Edmonds v. Banbury*, 28 Iowa 267, 270–73 (1869) (damages claim against acting judges of a local election for deprivation of the constitutional right to vote, but concluding the statute was constitutional and not addressing damages).

We have respectfully considered the additional cases cited by our dissenting colleagues in their thoughtful opinions. As Justice Mansfield notes in his concurrence, our pre-ITCA caselaw does appear to have taken some twists and turns. Even so, we are not convinced that state officials acting within the scope of their employment could be sued for damages for miscalculating a release date, as Sikora claims here.

Second, and in any event, we recognized in *Burnett* that "the legislature can enact laws that modify the common law." 990 N.W.2d at 305. So even if we were to assume that the common law permitted money damages suits against state officials for wrongful imprisonment, the ITCA plainly eliminated that right by making those officials immune. This is the plain import of Iowa Code sections 669.14(4) and 669.23.

Again, we have respectfully considered the contrary views of our dissenting colleagues. We are not blind to their concerns or the authorities they cite. But, for the reasons already discussed, as well as those explained in the concurrence, we respectfully disagree with their suggestion that we should invalidate the

immunity granted by our legislature through Iowa Code sections 669.14(4) and 669.23.

In brief summary: This court does not invalidate the legislature's acts unless they are plainly "repugnant to some provision of the constitution." *State ex rel. Att'y Gen. v. Autor,* 991 N.W.2d 159, 163 (Iowa 2023) (quoting *Littleton v. Fritz,* 22 N.W. 641, 646 (Iowa 1885)). And no provision of our constitution is offended by section 669.14(4), section 669.23, or their prohibitions on certain money damages claims against state employees. Rather, our constitution authorized the lawmaking branch of our government—the legislature—to decide whether Iowa's common law should be limited in that fashion. *See* Iowa Const. art. III, § 1; *Burnett,* 990 N.W.2d at 305. Our role is to give effect to that legislative choice, not to second-guess it.

3. *Trespass on the case.* Sikora also claims that the district court should have allowed him to add a claim for trespass on the case. But we see no abuse of discretion in the district court's refusal. *Rife v. D.T. Corner, Inc.,* 641 N.W.2d 761, 766 (Iowa 2002) (standard of review for motions for leave to amend pleadings).

To begin with, it's not clear this is a valid claim in any context. Although our older cases mention "trespass on the case," it appears to have been replaced by modern causes of action like negligence. *Miranda v. Said,* 836 N.W.2d 8, 17 n.7 (Iowa 2013) (citing authorities); *N.Y. Life Ins. v. Clay County,* 267 N.W. 79, 80–81 (Iowa 1936).

In any event, because Sikora is trying to sue the state and its employees, we do not focus on the labels he attaches to his claims. His claims are all about the same alleged wrong: his wrongful imprisonment. And, as explained, sovereign immunity and the ITCA bar those wrongful-imprisonment claims. *Cf.*

*Trobaugh*, 668 N.W.2d at 584–85; *Hawkeye By–Prods., Inc.*, 419 N.W.2d at 411–12; *Greene*, 406 N.W.2d at 436 (concluding that sovereign immunity blocked a claim against a state agency for alleged jailing without due process because that claim was the functional equivalent of false arrest or false imprisonment, and citing what is now section 669.14(4)).

Sikora suggests that the trespass on the case theory allows him to avoid sovereign immunity by somehow splitting his physical imprisonment away from the resulting deprivation of constitutional rights. We disagree. The relevant inquiry is whether the alleged wrong is functionally equivalent to one of the categories described in section 669.14(4). In deciding what "wrong" is alleged, we focus on what *government conduct* allegedly harmed the plaintiff. *Minor*, 819 N.W.2d at 406. Here the government conduct is wrongful imprisonment. That falls squarely within section 669.14(4).

4. *Bond under Iowa Code chapter 64.* Sikora also claims that even if his other claims are precluded, the district court should have allowed him to proceed against the director defendants' blanket bonds as authorized by Iowa Code chapter 64. Here, again, we see no abuse of discretion.

Although chapter 64 requires some public employees to obtain bonds, *see id.* §§ 64.1A, .2, state officials like the director defendants "are not required to obtain bonds," *id.* § 64.6. They "may," however, "be covered under a blanket bond for state employees." *Id.* Our record does not show whether the director defendants were actually covered by any bond or not. But because the case was dismissed at the pleadings stage, we assume there was a blanket bond. We also assume it covered the director defendants.

With those assumptions in mind, we acknowledge that some parts of chapter 64 may appear to support Sikora's view. For instance, although

section 64.18 says that "[a]ll bonds of public officers shall run to the state," it also says that those bonds "shall . . . be for the use . . . of any . . . person injured or sustaining loss, with a right of action in the name of the state for its or the . . . person's use." *Id.* § 64.18. This suggests that there are at least some situations in which a private person could recover for some injuries caused by some public officers. For example, in *Scott v. Feilschmidt*, a minor who was wrongfully arrested by a Sioux City police officer was successful in suing against the officer's bond. 182 N.W. 382, 383–85 (Iowa 1921).

As the district court rightly noted, though, a different result is required here. While *Scott* involved a local official, the director defendants here are state officials. *Cf. id.* at 383. And the ITCA is the exclusive mechanism for tort claims against state officials acting within the scope of their employment. Iowa Code §§ 669.2(3), .4, .5(2); *Wagner*, 952 N.W.2d at 856–57 (collecting cases). While the ITCA allows some of those claims to proceed, the ITCA explicitly prohibits claims based on false imprisonment. Iowa Code § 669.14(4). To whatever extent this prohibition conflicts with chapter 64, the ITCA's prohibition prevails. It prevails because the ITCA is the more specific statute: the ITCA specifically addresses wrongful imprisonment, but chapter 64 does not. *See id.* § 4.7. The ITCA also prevails because it is the most recent enactment: while chapter 64 and its predecessors have been part of our Code since the Civil War, the ITCA was not enacted until 1965. *See id.* § 4.8; 1965 Iowa Acts ch. 79 (originally codified at Iowa Code ch. 25A (1966), now codified as amended at Iowa Code ch. 669 (2022)); Iowa Code ch. 36 (1860) (providing bonding requirements).

So we agree with the district court that chapter 64 doesn't allow a claim for Sikora's wrongful imprisonment. That is true whether Sikora names the

director defendants themselves or their bonding company, whose liability can only be derivative of the directors'.

**D. The Rights of Prisoners.** For the reasons explained, we conclude that the district court properly rejected Sikora's state law claims *for money damages*.

But this does not mean that our courts are unable to help persons who are wrongfully detained in Iowa prisons. If Sikora had asked our courts for *non-monetary relief*—like an order to release him from prison—sovereign immunity would not have foreclosed his request. In fact, our legislature has specifically authorized proceedings "to secure relief" because a "person's sentence has expired . . . or the person is otherwise unlawfully held in custody or other restraint." Iowa Code § 822.2(1)(*e*). Sikora did not ask for this relief.

We also note that there are pathways for wrongfully convicted prisoners to obtain money damages in state court. Through Iowa Code chapter 663A, our legislature waived sovereign immunity to permit money damages claims by people who are imprisoned because of wrongful convictions. But chapter 663A does not apply to Sikora because he pleaded guilty to his crimes. *Id.* § 663A.1(1)(*b*); *Rhoades v. State*, 880 N.W.2d 431, 451 (Iowa 2016) (Waterman, J., concurring specially) (explaining that relief under chapter 663A is not available to individuals who pleaded guilty).

Finally, we note that state officials who detain prisoners beyond their maximum release dates may be liable in their individual capacities for federal constitutional violations under 42 U.S.C. § 1983. *See, e.g., Davis v. Hall*, 375 F.3d 703, 706–09, 712–20 (8th Cir. 2004); *Teets v. Wetzel*, 630 F. Supp. 3d 679, 682–85 (W.D. Pa. 2022); *Traweek v. Gusman*, 414 F. Supp. 3d 847, 853–55, 867–69 (E.D. La. 2019); *Harris v. Hammon*, 914 F. Supp. 2d 1026, 1029–31, 1035–40 (D. Minn. 2012).

**III. Disposition.**

The district court was correct to reject Sikora's state-law money damages claims. We affirm.

**Affirmed.**

Christensen, C.J., and Waterman and Mansfield, JJ., join this opinion. Mansfield, J., files a concurring opinion, in which Christensen, C.J., and Waterman, J., join. McDonald, J., files a dissenting opinion, in which Oxley and McDermott, JJ., join. Oxley, J., files a dissenting opinion, in which McDonald and McDermott, JJ., join. McDermott, J., files a dissenting opinion, in which McDonald and Oxley, JJ., join.

**Mansfield, Justice (concurring).**

I join the majority opinion in full while adding the following observations concerning the dissents.

In *Burnett v. Smith*, 990 N.W.2d 289, 307 (Iowa 2023), this court unanimously overruled *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), which allowed damages claims to be brought directly under the Iowa Constitution without prior legislative authorization. Thus, we "restore[d] the law as it existed in this state before 2017." *Burnett*, 990 N.W.2d at 291. Today's dissents don't *say* they would overrule *Burnett* and bring back *Godfrey*, but in reality, they would.

Here is the dissents' reasoning. Eugene Sikora *can't* sue the director of the Iowa Department of Corrections (IDOC) for damages for false imprisonment in violation of the Iowa Constitution. *Burnett* doesn't allow that. However, Sikora *can* sue the director personally for damages for committing the common law tort of false imprisonment, and the Iowa Constitution mandates the availability of this supposed common law tort action. In other words, the dissents would return *Burnett* through the back door. Instead of a direct action for damages *under* the Iowa Constitution, we would have a common law action for damages *protected by* the Iowa Constitution—truly a distinction without a difference.

When I dissented in *Godfrey*, I wrote,

> I disagree with the notion that constitutional monetary damage claims are some kind of time capsule that the drafters of our constitution buried in 1857 and that can only be unearthed now through the legal acumen of this court. The time capsule hasn't been found until now because no one buried it in the first place. Our framers did not anticipate that someone could simply walk into court with a constitutional provision in hand and file a lawsuit to recover money, including punitive damages.

898 N.W.2d at 882 (Mansfield, J., dissenting).

A similar point can be made about today's dissents. The dissenters would declare unconstitutional a statutory provision, Iowa Code section 669.23 (2022), that has been around for over forty years. During that time, Iowa has had many distinguished jurists and attorneys. To my knowledge, no one has previously challenged the constitutionality of section 669.23. If section 669.23 really had some constitutional defect, wouldn't someone have noticed it before now?

The dissents make several critical errors. First, they are incorrect about the relief that would have been available to Sikora at common law. Second, they disregard the general assembly's authority to modify the common law. Third, they invent new, ill-defined doctrines of Iowa constitutional law—specifically (1) "constitutional superstructure" and (2) "general law"—to justify their desired outcome. Fourth, they imagine a parade of horribles that would arise if Sikora couldn't bring his damages claim, while ignoring the fact that if Sikora were a federal prisoner with exactly the same claim, there is no doubt it would be barred. Finally, their version of *Godfrey*-lite, like *Godfrey* itself, would be impractical and unworkable.

**I. Sikora's Petition.**

It's worth noting that Sikora's petitions describe a complicated situation. According to his first two petitions, Sikora was sentenced on three separate class "D" felonies arising out of three separate counties on May 6, 2016. On April 26, 2017, his probation was revoked and his original prison sentence was imposed. On April 17, 2018, Sikora was released on parole. On December 8 of that year, Sikora was arrested for parole revocation and incarcerated once again. Allegedly, Sikora was entitled to 292 days of credit based upon 118 days in the Cerro Gordo County jail, 90 days in the Hancock County jail, 17 hours and

15 minutes in the Winnebago County jail, and 83 days at a residential treatment center. Allegedly, on March 19, 2019, a "parole officer was informed by the Iowa Department of Corrections that [Sikora's] time calculation was corrected and [Sikora] was to have discharged his sentence on February 19, 2019, resulting in an additional number of days served." At that point, Sikora "was immediately discharged from his sentence." Sikora alleges that he had previously complained to the IDOC that his release date was being calculated incorrectly.

In their answer, the defendants dispute Sikora's calculations. According to the defendants, Sikora spent 85 days in the Cerro Gordo jail and 60 days in the Hancock County jail. He was not detained improperly.

Over a year into the litigation, Sikora submitted a proposed second amended petition. This version of the petition goes further, while injecting additional complexity. According to this petition, the IDOC "misapplied Sikora's previous time served in jail and residential facilities." After taking into account statutory earned time credits, Sikora should have been released on October 24, 2018—i.e., before his December 8, 2018 arrest for parole revocation. In short, the second amended petition claimed that Sikora had been wrongfully detained in prison for nearly five months, rather than one month as alleged in the first two petitions.

Sikora names, in effect, only one type of individual defendant—the persons who occupied the post of director of the IDOC at various times. Yet nothing in any of Sikora's petitions suggests that the director of the IDOC would have had any actual involvement in Sikora's situation, except for the conclusory allegation that the director "knew or should have known that Plaintiff was being held past the date of his sentence."

Facts matter. Before our court launches a new legal vessel, one thing we ought to consider is how seaworthy its facts are. In *Burnett*, we pointed out that *Godfrey* had become a device for advancing claims of questionable merit. *Burnett*, 990 N.W.2d at 301–02. As we put it, "[I]t is unclear whether *Godfrey*, at a practical level, is really needed. Does it fill a remedial gap in our law?" *Id.* at 302.

Today's dissents discuss an abstract case of false imprisonment, rather than the actual facts here. As the foregoing summary reveals, Sikora undisputably was sent to prison in May 2016 for three class "D" felonies, then he violated the terms of his probation, and then he violated the terms of his parole. Even so, he was discharged in March 2019. It took Sikora's able counsel over a year into the litigation to sort through this complexity and assert the current claim that Sikora was wrongfully imprisoned for a five-month period.

Also, Sikora has sued only the head of the IDOC. The Iowa prison system has about 8,500 inmates. I would be very surprised if the IDOC director had any personal connection to Sikora's situation, such as would be necessary to sustain a tort claim against her, if such a claim existed. *See Klemm v. Adair*, 179 N.W. 51, 52 (Iowa 1920) (stating that a false imprisonment case is sufficient to go to the jury "if there be evidence tending to show that the acts of the defendant were a proximate and efficient cause of the arrest"). The dissents have attached their doubtful legal theories to a doubtful case.

**II. Sikora Would Not Have Had an Action Against the Director of the IDOC Personally at Common Law.**

The dissents maintain that prior to the enactment of the Iowa Tort Claims Act (ITCA), Sikora would have been able to sue the director of the IDOC personally for false imprisonment for having been detained past his release date. I disagree.

**A. Iowa Pre-ITCA Authority.** Before the ITCA was enacted, a common law damages suit could not have been brought against the director as a state official personally. I agree that on a close examination, our pre-ITCA law appears to have taken some twists and turns. "At the outset it can be fairly stated that the Iowa law on the subject of a public employee's liability is not settled." J. Robert Hard, *Liability of Public Bodies, Officers, and Employees—Governmental Immunity*, 11 Drake L. Rev. 79, 99 (1962). Yet a consistent parameter was the inability to sue a state official personally over errors in carrying out a governmental function.

In *Henry Quellmalz Lumber & Mfg. Co. v. Hollowell*, 200 N.W. 177, 177 (1924), we rejected a claim against the warden of the Fort Madison penitentiary for materials he had ordered, stating, "The managing officers of an arm of the state government are not personally liable for acts done by them in the performance of governmental functions."

We have also held that even a local official cannot be sued for damages for an allegedly incorrect incarceration, such as occurred here. *See Green v. Talbot*, 36 Iowa 499, 500–01 (1873). In *Green v. Talbot*, we held that a mayor who had mistakenly imprisoned the plaintiff for forty-eight hours while lacking the authority to do so could not be liable unless he "acted maliciously or corruptly." *Id.*

In a landmark 1938 decision, we took the position that we were altering the common law when we held that a county employee who negligently drove a truck could be sued personally in a damages action. *Montanick v. McMillin*, 280 N.W. 608, 613–17 (Iowa 1938). We said that "an employee of a city, county or state who commits a wrongful or tortious act, violates a duty which he owed to the one who is injured, and is personally liable." *Id.* at 617. We reached this conclusion because we felt that "the common law has within itself the quality

and capacity for growth and of adaptation to new conditions." *Id.* at 616. Yet we highlighted

> a well marked distinction between an act of an employee, agent or officer of the state or arm thereof, which is done as an act per se governmental in its nature and an act which, though performed by the agent or officer while he is engaged in a public duty, is nevertheless unrelated to the performance of the duty in any other way. An employee of the county may, for instance, during the hours of darkness step into the driver's seat of an automobile, and without turning on the lights and on the wrong side of the street, with the lights at an intersection set against him, at an excessive speed, collide with a pedestrian lawfully crossing at the intersection. The fact that the negligent person is a governmental employee should certainly not exonerate him from the consequences of his negligence.

*Id.* In other words, a public official could be sued personally for damages for bad driving but not for poor performance of "an act per se governmental in its nature," such as miscalculation of a release date. *Id.*

We continued to follow the *Montanick v. McMillin* distinction until the enactment of the ITCA. Thus, in *Johnson v. Baker*, 120 N.W.2d 502, 503, 508 (Iowa 1963), we held that state patrol officers could be sued in a traffic accident case. At the same time, we declined to reexamine the rule that public officials could not be sued personally over allegations of nonfeasance. *Id.* at 507 ("The holding of the Montanick case is limited to acts of misfeasance.").

So, there should be no question that prior to the enactment of the ITCA, the director of the IDOC could not have been sued personally for an alleged miscalculation of time resulting in a delayed release of a convicted state prisoner. Regardless of how one wishes to characterize what allegedly occurred in this case, it was clearly an act of nonfeasance in the exercise of a governmental function.

**B. The Dissents' Cases.** Turning to the dissents' authority, there is less than meets the eye. The dissents insist that state officials could be sued for

damages in their personal capacity on any common law cause of action as a way to get around state sovereign immunity. But their Iowa state officer cases do not support that proposition.

In *Metz v. Soule, Kretsinger & Co.*, 40 Iowa 236, 236–37 (1875), our legislature had passed a *private bill* to compensate an inmate for injuries he suffered while "acting under the orders of the officers and guards of the Iowa Penitentiary." The opinion does not indicate that the inmate otherwise could have sued those officers and guards. *See id.*

In *A'Hern v. Iowa State Agricultural Soc.*, 58 N.W. 1092, 1092 (Iowa 1894), the plaintiffs sought to hold the defendant society liable for wrongful acts committed by officers and agents of the society *outside* the scope of their employment. Although the acts aren't specifically identified, we can guess that they involved some form of mayhem—including "assault"—at "the annual exhibition of the society." *Id.* We affirmed the dismissal of the society, reasoning,

> The society is an arm or agency of the state, organized for the promotion of the public good, and for the advancement of the agricultural interests of the state. It would be manifestly wrong to permit its funds to be used to pay damages arising out of the commission of wrongful acts by its officers and servants, and which are in no wise connected with the object and purpose of the society's creation.

*Id.* at 1093. Since the case involved officers and agents who were unquestionably acting outside the scope of their employment, it has no bearing on the present case.

*Hoover v. Iowa State Highway Commission*, 222 N.W. 438 (Iowa 1928), is distinguishable in several respects. It was a suit against state officials for *injunctive relief, id.* at 439—the very exception that the United States Supreme Court recognized in *Ex parte Young*, 209 U.S. 123, 155–56 (1908), and that we

follow to this day. *See, e.g.*, *Lee v. State*, 815 N.W.2d 731, 743 (Iowa 2012). We said in *Hoover*,

> [W]here the individuals, composing a commission or board or other arm of the state, violate the clear provisions of the state Constitution or statute, and attempt to appropriate private property for public use without authority, the rights of the owner may be protected by the courts through the agency of an injunction or some other suitable means.

222 N.W. at 440. We added, "Clearly the power of the courts to restrain state officials from violating plain provisions of the statute and Constitution is in no way derogatory to the general and well-recognized rule that the state cannot be sued without its consent." *Id.*

*Coleman v. Tierney*, 165 N.W. 41, 41–42 (Iowa 1917), reversed a jury verdict against a deputy state game warden in a false arrest case. It doesn't stand for any legal proposition relevant to this case. The dissent of Justice McDonald quotes from the *jury instructions*, which were not objected to and which we did not approve of in the opinion. *See id.*

*Burris v. Titzell*, 177 N.W. 557, 558 (1920), involved a surgeon who received his salary from a state university where he was chair of surgery but who also performed surgery at a homeopathic hospital without separate compensation. Allegedly, he committed malpractice in connection with a surgery performed at that hospital. *Id.* at 558–59. We reversed for a new trial without discussing whether the surgeon had even been sued for work performed as a state employee. *See id.* at 562–63.

Lastly, *Marquart v. Maucker*, 184 N.W.2d 684 (Iowa 1971), was an oddball case of more recent vintage. A former employee of the University of Northern Iowa sued officers and employees of the university on the theory that they had willfully and maliciously withheld $100.75 from her final paycheck for parking violations.

*Id.* at 684–85. It's not clear that the former employee was even bringing a common law claim. *See id.* Justice McDonald's dissent maintains that Iowa Code section 669.23 was enacted in response to the *Marquart* decision. But *Marquart* was decided in 1971, and section 669.23 was enacted in 1984—thirteen years later. *See* 1984 Iowa Acts ch. 1259 § 4 (originally codified at Iowa Code § 25A.23 (1985), now codified as amended at Iowa Code § 669.23 (2022)).

**C. *Wagner v. State* and Other Post-ITCA Caselaw.** I now turn to post-ITCA authority.

In *Wagner v. State*, 952 N.W.2d 843, 856–57 & n.5 (Iowa 2020), we explained that sovereign immunity in Iowa barred tort claims against the state and state officials for acts taken within the scope of their employment. We quoted *Dickerson v. Mertz*, 547 N.W.2d 208, 213 (Iowa 1996), where we had said, "The doctrine of sovereign immunity dictates that a tort claim against the state or an employee acting within the scope of his office or employment with the state must be brought, if at all, pursuant to [the ITCA]." *Wagner*, 952 N.W.2d at 856 (alteration in original) (quoting *Dickerson*, 547 N.W.2d at 213). We also cited *Anderson v. Moon*, 279 N.W. 396, 397 (Iowa 1938), for the proposition that "[t]he pre-1965 immunity extended to state officials when performing official duties." *Wagner*, 952 N.W.2d at 857 n.5. *Anderson* had observed that an investigator for a state agency would have immunity only "for an act committed in the performance of some governmental duty." 279 N.W. at 397.

All three dissenters joined *Wagner*. While they are of course entitled to disagree with what they once joined, two of them embellish their disagreements, in my view inappropriately.

In his dissent, Justice McDonald says that the foregoing discussion in *Wagner* was "dicta." This is a term that judges often overuse, and I believe that

Justice McDonald is overusing it here. A certified question that we had to answer in *Wagner* was whether the ITCA's procedural framework applied to constitutional tort claims. 952 N.W.2d at 851. We concluded that it did. *Id.* at 857–58. As one step in our reasoning, we explained that *but for* the ITCA, a state official acting within the scope of their employment could not be sued in tort at all. *Id.* at 856–57. In other words, even if we excused constitutional tort claims from the substantive limits of the ITCA, it did not make sense to excuse them from the ITCA's procedural limits. *Id.* at 857–59. Therefore, what we said in *Wagner* was necessary to the reasoning in the opinion; it was not a gratuitous statement of how we would decide some other case not before us.

Justice Oxley repeats Justice McDonald's erroneous claim that the *Wagner* discussion was dicta. She also admonishes the court on the importance of "tracing the quoted legal proposition through the cases cited to support it." But she does not claim that *Wagner* misquoted or misinterpreted *Dickerson* or any other case. Moreover, what we said in *Wagner* was supported by other post-ITCA caselaw in addition to *Dickerson*. For example, in *McGill v. Fish*, 790 N.W.2d 113, 120 (Iowa 2010), we explained that prior to the ITCA, one state employee could not sue another state employee for gross negligence. The ITCA "recognized a remedy for existing causes of action previously unavailable because of sovereign immunity." *Id.* The ITCA, in other words, gave damages relief to tort victims where they previously had no such relief. *See also Engstrom v. State*, 461 N.W.2d 309, 314 (Iowa 1990) (stating that the ITCA "merely recognizes and provides a remedy for a cause of action already existing which would have otherwise been without remedy because of common law immunity"); *Graham v. Worthington*, 146 N.W.2d 626, 637 (Iowa 1966) (stating that before the ITCA was adopted, Iowa law "cast upon some unfortunate individuals the full burden of damage done by

the tortious conduct of state officers, agents or employees").[4] Thus, we have frequently taken the view that people injured by the torts of state officials committed within the scope of their employment were otherwise "without remedy" and bore "the full burden of damage" until the ITCA came along. *Engstrom*, 461 N.W.2d at 314; *Graham*, 146 N.W.2d at 637. Were all those statements an oversight?

**III. In Any Event, the Legislature Can Modify the Common Law.**

For the reasons explained, I do not believe the common law previously permitted personal damages lawsuits against officers of the State of Iowa for governmental actions they had taken in the scope of their employment. Regardless, the legislature was entitled to modify the common law.

The dissents concede that the clear language of the Iowa Code blocks any claim here. Iowa Code section 669.14(4) excepts any claim for false imprisonment from the ITCA, and Iowa Code section 669.23 provides that "[e]mployees of the state are not personally liable for any claim which is exempted under section 669.14." So the only issue is whether the general assembly could do what it did.

Our constitution didn't freeze the common law. To the contrary, it established a general assembly with authority to enact laws *modifying* the common law. *See* Iowa Const. art. III, § 1. In the first Code adopted after the ratification of our constitution, the legislature provided, "The rule of the common law that statutes in derogation thereof are to be strictly construed, has no application to this code." Iowa Code § 2622 (1860). That provision has remained in our Code continuously to this day. *See* Iowa Code § 4.2 (2025) ("The rule of

---

[4]*See also Sanford v. Manternach*, 601 N.W.2d 360, 370 (Iowa 1999) (quoting *Engstrom v. State* with approval); *Magers-Fionof v. State*, 555 N.W.2d 672, 674 (Iowa 1996) (same).

the common law, that statutes in derogation thereof are to be strictly construed, has no application to this Code.").

And if there has never been a rule in Iowa against interpreting statutes as modifying the common law, then clearly statutes *can* modify the common law. As we said three years ago in *Garrison v. New Fashion Pork LLP*:

> [T]he legislature is free to enact laws that affect how people use and enjoy their land. These laws can alter the common law. For example, in *Democko v. Iowa Department of Natural Resources*, we held the legislature could deprive landowners of the common law right to hunt on their property. 840 N.W.2d 281, 293 (Iowa 2013). We noted that "the nub of the issue is whether, under Iowa law, an Iowa landowner has a property right to hunt on his or her property. Regardless of what might have been at common law, we conclude the legislature has extinguished any such right." *Id.*; *see also Pure Air & Water* [*Inc. of Chemung Cnty. v. Davidsen*], 668 N.Y.S.2d [248,] 249–50 [(App. Div. 1998)] (rejecting challenge to New York's right-to-farm statute that eliminated private nuisance claims because "a person does not have a vested interest in any rule of the common law"). The common law is not frozen and it can be modified by the legislature so long as the legislation passes the rational basis test and does not amount to a taking without just compensation.

977 N.W.2d 67, 88 (Iowa 2022).

> What we said in *Garrison* was not new:

> It is properly the province of the legislature to alter the common law by enactments deemed conducive to the welfare of the state. Such laws emanating from that body are presumed to express the will of the sovereign people, and when enacted within the prescribed limits of the constitution, are binding as the law of the land, and must be observed. It is the imperative and only duty of the courts to expound and enforce the observance of the laws, not to enact them.

*Nash v. State*, 2 Greene 286, 291–92 (Iowa 1849); *see also Gatton v. Chi., R.I. & P. Ry.*, 63 N.W. 589, 600 (Iowa 1895) ("[I]t is undeniable that in any state in which the common law may be in force the legislature may alter it, or set it aside.").

And we reiterated this point in *Burnett*: "[T]he legislature can enact laws that modify the common law." 990 N.W.2d at 305.

None of this means that a prisoner like Sikora has no remedy if they are being held beyond the term of their sentence. Iowa Code section 822.2(1)(*e*) (2022) authorizes a prisoner to file an application for postconviction relief if they are still being detained and their "sentence has expired." Or a writ of mandamus may be available. *See Masteller v. Bd. of Control of State Insts.*, 100 N.W.2d 111, 115 (Iowa 1959) ("We . . . remand the case to the trial court and direct that a writ of mandamus issue to the defendants requiring them to correct the proper records so as to allow the plaintiff such relief under the 'good time' statutes . . . ."); 55 C.J.S. *Mandamus* § 306, at 406–09 (2021). What Sikora doesn't have is a suit for *damages*. The general assembly has made that clear.

**IV. Nebulous Concepts Such as "Constitutional Superstructure" and "General Law" Do Not Override the Iowa Code and Give a Prisoner the Right to Sue the Director of a State Department of Corrections for Damages for Miscalculation of a Sentence.**

To try to bolster their position, the dissents invoke writings from recent law review articles along with some vague legal constructs.

**A. Justice McDonald's Dissent.** Justice McDonald's dissent quotes at length from a 2024 Harvard Law Review student comment criticizing our *Burnett* decision. *See* Recent Case, Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023)*, 137 Harv. L. Rev. 1026 (2024). This demonstrates that Justice McDonald's views are irreconcilable with *Burnett* itself.

Justice McDonald's dissent also refers to what he describes as "the state constitutional superstructure." The term "constitutional superstructure" is a new one as far as I know. Normally, "superstructure" refers to something that is built *on top of* something else. It is an apt descriptor for a jerry-rigged legal

approach that would erect a new rule of constitutional law on top of what the 1857 Iowa Constitution actually says and does. Thus, the rule in Justice McDonald's dissent would prevent the general assembly from passing a law prohibiting false imprisonment lawsuits for damages against state officials acting within the scope of their employment, although nothing in the constitution actually says or does this.

*Structural* (as opposed to "superstructural") interpretations are not unusual and have been with us for some time. *See generally* Charles L. Black, Jr., *Structure and Relationship in Constitutional Law* 15–16 (1983). The notion behind structural interpretations is that some constitutional rights can be derived from the structure established in the constitution itself—for example, the right to travel as part of the United States Constitution. *See id.* A structural approach, in my view, has less of a role to play with the Iowa Constitution, which is about three times as long as the United States Constitution and contains much more textual detail.

In any event, nothing in the structure of the Iowa Constitution (as opposed to Justice McDonald's imagined superstructure) supports the invalidation of Iowa Code section 669.23. To the contrary, as we pointed out in *Burnett*, 990 N.W.2d at 299, our constitution makes it clear that while "[the Iowa] Constitution [is] the supreme law of the state," it is up to the general assembly to "pass all laws necessary to carry this Constitution into effect," Iowa Const. art. XII, § 1. In other words, the state can't violate the Iowa Constitution, and courts can stop it from doing so when a proper case is before them, but the general assembly gets to decide what laws to enact to implement the constitution, including when to provide a damages remedy. That's the structure our framers gave us.

Justice McDonald also claims that Iowa Code section 669.23 violates the "inalienable rights" clause. *See* Iowa Const. art I, § 1. As I've previously pointed out, *see Garrison*, 977 N.W.2d at 92 (Mansfield, J., concurring), that clause is essentially a paraphrase of language in the Declaration of Independence. The clause provides,

> All men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness.

Iowa Const. art I, § 1. It has to be read in conjunction with article I, section 2, which also paraphrases the Declaration of Independence, and says,

> All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it.

*Id.* art. I, § 2.

Neither clause can or should be read as a source of enforceable rights. It would be ridiculous to say that Iowans get to sue the state to "obtain[] . . . happiness." *Id.* art. I, § 1. Or that they get "to alter" the elected state government, except at regular elections as provided elsewhere in the constitution. *Id.* art. I, § 2. It's noteworthy that the Declaration of Independence wasn't intended to be a blueprint for a new government; it was a statement of what was wrong with the existing colonial British government. In this regard, the inalienable rights clause in article I, section 1 and the power to the people clause in article I, section 2 provide overarching principles, not law that one can put in one's pocket and take to court. As I explained in my *Garrison* concurrence,

> [W]e already have language in article I, sections 9 and 18 expressly limiting the state's ability to interfere with life, liberty, and property. *See* [Iowa Const.] art. I, §§ 9 ("[N]o person shall be deprived of life, liberty, or property, without due process of law."), 18 ("Private

property shall not be taken for public use without just compensation first being made . . . ."). It would be illogical to conclude that the general and aspirational statement of rights in article I, section 1 could trump—or be used to alter the effect of—the more direct and specific language in article I, sections 9 and 18.

Unlike article I, section 1, the meat-and-potatoes provisions of our Bill of Rights have operational rather than just aspirational language. *See, e.g., id.* art. I, §§ 6 ("[T]he general assembly shall not grant . . . ."), 7 ("No law shall be passed . . . ."), 8 ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated . . . ."), 9 ("[N]o person shall be deprived . . . ."), 10 ("In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right . . . ."), 18 ("Private property shall not be taken for public use . . . ."). Notably, once you get past article I, sections 1 and 2, all but one of the twenty-two enumerated rights contain the word "shall." *See id.* art. I, §§ 3–4, 6– 19, 21–25.

977 N.W.2d at 92–93 (Mansfield, J., concurring) (first, third, fourth, and fifth alterations in original).

In recognition of this, we have traditionally held that the inalienable rights clause triggers only "rational basis" review—which means that as a stand-alone source of rights, it doesn't add anything. *Id.* at 93. As we put it in *Atwood v. Vilsack*, 725 N.W.2d 641, 652 (Iowa 2006), Justice McDonald's flagship inalienable-rights case, it allows the legislature to take "reasonable action." One can debate the merits of a damages action against a state prison official over a delayed release, but I have trouble viewing the application of section 669.23 as lacking any rational basis.

In the end, Justice McDonald's dissent is *ipse dixit.* He concludes that it is "unduly oppressive" and therefore "constitutionally forbidden" to take away the alleged common law right of inmates to sue state prison officials for damages for delays in their release. And what is the basis for this conclusion?

Justice McDonald directs us to three items. The first is his own concurrence in *Lennette v. State*, 975 N.W.2d 380, 402–03 (Iowa 2022) (McDonald, J., concurring). The second is the North Carolina Supreme Court's decision in *Corum v. University of North Carolina*, 413 S.E.2d 276 (N.C. 1992). That case recognized a direct cause of action for damages under the North Carolina Constitution, *id.* at 293, and was relied on by the *Godfrey* majority; it's part of the law that we have now overruled. *See* 898 N.W.2d at 858, 860 (discussing *Corum*).[5] And the third item is a Harvard Law Review article that argues that federal constitutional violations require some effective remedy but focuses primarily on the availability of injunctive relief. Richard H. Fallon, Jr., *Constitutional Remedies: In One Era and Out the Other*, 136 Harv. L. Rev. 1300, 1312, 1337–48 (2023). Since items number two and number three don't really support Justice McDonald's position, we are really left with item number one, his own concurrence in *Lennette.*

**B. Justice McDermott's Dissent.** Justice McDermott's dissent likewise travels down an academic rabbit hole, quoting from a 2024 Stanford Law Review article. *See* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185 (2024) [hereinafter Baude et al.]. The Stanford Law Review article employs a somewhat different but equally amorphous term—namely, "general law." *See id.* at 1185. According to Justice

---

[5]The North Carolina Supreme Court has also made clear that *Corum* is "extraordinary and subject to considerable limitations." *See Washington v. Cline*, 898 S.E.2d 667, 673 (N.C. 2024). Just last year, that court emphasized that a *Corum* claim is not available "when the plaintiff has access to court to raise the constitutional violation, and the court can provide some form of relief for that violation, even if plaintiff does not view that relief as complete." *Id.* at 671. Thus, the court held that a plaintiff who had been incarcerated but later exonerated due to a speedy trial violation could not pursue a constitutional tort damages claim because he had access to court to seek dismissal of the charges and release once the speedy trial violation occurred. *Id.* at 672. As I have discussed, Sikora likewise had nondamages remedies available if he believed his prison term had expired and he was being held unlawfully. Therefore, it seems unlikely that Sikora would be able to pursue a *Corum* claim if he lived in North Carolina.

McDermott, "general law" means here that the legislature must allow claims for damages by a prisoner against the director of the IDOC for the miscalculation of a release date. This is a "core" general right, according to Justice McDermott.

I don't believe that the Stanford Law Review article goes as far as Justice McDermott would take it. In the article, "general law" appears to be the authors' way of explaining that the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution protects certain fundamental rights against abridgment by the states. *See id.* at 1196–1199. Essentially, it's a new contribution to the longstanding debate over the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 74–82 (1872). *See* Baude et al., 76 Stan. L. Rev. at 1232–34. Although it makes for interesting reading, I fail to see how it would support the view that states must allow state court damages lawsuits against state corrections officials personally.

Justice McDermott also relies on an article on "constitutional backdrops." *See* Stephen E. Sachs, *Constitutional Backdrops*, 80 Geo. Wash. L. Rev. 1813 (2012). But it's important to distinguish what the article actually says from Justice McDermott's extrapolations. For the most part, the article speaks not of individual rights but of the *powers* of Congress, the President, the federal judiciary, and the states. *Id.* at 1815, 1854–76. Each of these entities, according to the author, have certain prerogatives. *See id.* They are not mentioned in the text of the United States Constitution, but they may not be impinged on by another entity without a constitutional amendment. *See id.* One of those "constitutional backdrops" is state sovereign immunity. *Id.* at 1868–75.

The article does contain two paragraphs on individual rights. *Id.* at 1866–67. But here the point being made is that "constitutional backdrops" may impose *limits* on otherwise textually unlimited rights set forth in the First and Second

Amendments. *Id.* It is purely Justice McDermott's invention to take this article and use it as a justification for a constitutionally protected damages remedy, especially when our constitution expressly leaves remedies for constitutional violations a matter for the legislature to decide. *See* Iowa Const. art. XII, § 1.

**C. Some Concluding Comments on "Constitutional Superstructure" and "General Law."** In the end, the terms don't matter. Whether we are talking about "constitutional superstructure" or "general law," the concepts are artificial and ultimately based on the policy preferences of the dissents' authors.

What makes a right to sue the director of the IDOC personally for damages part of our "general law" that the legislature cannot eliminate? Here is Justice McDermott's answer:

> By foreclosing claims against state officials when those officials unlawfully imprison citizens, the state oversteps its regulatory authority. The right to pursue a claim against a state official for false imprisonment was well-established at the time of the founding and is part of the core rights embedded within the law to preserve fundamental constitutional rights. (Indeed, the doctrine of state sovereign immunity itself, which the majority relies on, but which is nowhere mentioned in the constitution's text, arguably derives from a constitutional backdrop as well. *See* Sachs, *Constitutional Backdrops*, 80 Geo. Wash. L. Rev. at 1868–72.) The ability to bring a false imprisonment claim provides both a remedy to victims and promotes deterrence against further abridgements. The majority's dismissal of Sikora's claim leaves him without a remedy despite his having allegedly suffered five months of unlawful confinement. And after today, it is hard to see what disincentive any state prison official would have to unlawfully hold an inmate well beyond his release date.

A careful reader can see that this is just a *policy* argument. At the end of the day, "general law" boils down to the views of a justice as to proper policy. According to Justice McDermott, a damages remedy is needed to give state prison officials an incentive to release inmates on time. But what about the contrary arguments that inmates have a nondamages remedy if they aren't released on

time, that most public officials are conscientious about doing the right thing and don't need a threat of damages litigation hanging over their heads, that releasing prisoners on time saves money and resources, and that being subject to personal damages awards would discourage public service?[6]

Turning back to the dissent of Justice McDonald, we need to ask what makes a suit against the director of the IDOC for damages for miscalculating a release date part of the "constitutional superstructure." Again, the answer reeks of policy:

> The defendants' claim of sovereign immunity in this case is nothing more than an assertion that the government and its officials have the unilateral right to alter the state constitution through normal legislation and wrongly imprison people without being held to account. That assertion is odious and repugnant to republican constitutional order. The state has a duty to protect the liberty of its people, not destroy it.

This overheated rhetoric obscures several points. No one is saying that there is a legal right to hold a prisoner past their release date or that a prisoner would lack a remedy. The only issue is whether the prisoner can bring a damages lawsuit. To one justice it may appear "odious" that a state prisoner can't sue the director of IDOC personally for damages, but I am confident that other jurists in this state could identify other recent decisions of this court as posing greater threats to personal liberty. Constitutional doctrine should not depend on what one justice—or even several justices—view as "oppressive," "odious," or "repugnant."

---

[6]Turning to another point, the parenthetical in the quotation suggests the majority is being inconsistent. That's not correct. State sovereign immunity may be a background principle, but we are not saying that the state cannot modify it (i.e., waive it) through its lawmaking authority. Indeed, the legislature has modified it by enacting the ITCA. Justice McDermott, on the other hand, would curtail the legislature's authority over the common law action for damages for false imprisonment.

**V. The Dissents' Emotional Appeals Should Be Weighed Against What the Caselaw Actually Says.**

As noted, the dissents' rhetoric is free-flowing. One dissent insists that "[n]ot even King George III" would have taken away Sikora's right to sue the director of the IDOC for damages for miscalculation of his release date.

To put this hyperbole in perspective, it's useful to examine what the situation would be if Sikora were serving a *federal* sentence and *federal* prison officials had allegedly done the same thing to him. Guess what? Sikora would have no damages remedy there either.

In *Snow-Erlin v. United States*, it was undisputed that the United States kept the plaintiff's late husband imprisoned for 311 days too long. 470 F.3d 804, 808–09 (9th Cir. 2006). However, the court had little trouble rejecting a damages claim based on the exclusion of false imprisonment claims in the Federal Tort Claims Act—which is analogous to the exclusion in the ITCA. *See id.* at 809.

Nor would Sikora have been able to pursue a constitutional claim for damages against prison officials in their individual capacity under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The United States Supreme Court has made clear that such claims are "disfavored." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)). Such a claim should not be recognized outside of the three previously established contexts "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context.'" *Id.* at 492 (quoting *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020)). Accordingly, miscalculation of release date claims cannot be brought as *Bivens* claims. *See Shade v. Bureau of Prisons,* No. 1:23–00192, 2024 WL 4603246, at *1, 4 (S.D. W. Va. Oct. 29, 2024) (rejecting *Bivens* claim by prisoner who claimed prison officials miscalculated his release date and

overdetained him by 109 days), *appeal docketed*, No. 24–7102 (4th Cir. Nov. 19, 2024).

A number of states besides Iowa reject these sorts of claims. *See, e.g.*, *Kinegak v. State*, 129 P.3d 887, 887–88 (Alaska 2006) (affirming dismissal of damages claim based on the plaintiff's detention seven days after his sentences ended); *Heilman v. Courtney*, No. A17–0863, 2019 WL 4008097, at *1–3 (Minn. Ct. App. Aug. 26, 2019) (granting summary judgment to the defendant in a case seeking damages for detention past the release date); *Tillman v. Miss. Dep't of Corr.*, 95 So. 3d 716, 718–19 (Miss. Ct. App. 2012) (holding that an inmate's claim for damages based on the department of corrections having detained him past his release date and having ignored his demands for release was barred by legislative language precluding claims that arose when the plaintiff was an inmate). In *Davis v. State*, the Nebraska Supreme Court rejected an inmate's false imprisonment claim against various state officials based on a miscalculation of a release date, reasoning,

> Davis' allegations that the prison officials negligently calculated his parole eligibility date does not preclude the application of the false imprisonment exception. The heart of his claim is that he was unlawfully reincarcerated, and no further discovery could correct that fundamental defect in his complaint. His negligence claim against the state defendants arose out of their alleged contribution to his unlawful imprisonment, their failure to correct the mistake, or their failure to ensure that such mistakes would not occur.
>
> As explained, under the [State Tort Claims Act], if an officer or employee was acting within the scope of his or her office or employment and the alleged tortious conduct falls within an exception to the State's waiver of tort immunity, the STCA bars a tort claim against the officer or employee, regardless of the capacity in which he or she was purportedly sued.

902 N.W.2d 165, 187 (Neb. 2017).

It is true that some states allow damages claims in certain circumstances when a prisoner is detained past their release date. *See, e.g.*, *Evans v. State*, 55 Ill. Ct. Cl. 395, 398–99 (2002); *Hudson v. State*, 981 N.Y.S.2d 479, 480–81 (App. Div. 2014); *Johnson v. Madison Cnty. Ct. of Common Pleas*, 77 N.E.3d 978, 979 (Ohio 2017) (per curiam); *Watkins v. Wash. State Dep't of Corr.*, No. 39482–4–III, 2024 WL 278558, at *4–5 (Wash. Ct. App. Jan. 25, 2024). But that hardly means that a state should be regarded as uncivilized—as suggested by the dissenters—if its legislature elects *not* to recognize such claims and that determination is upheld by the state supreme court.

Indeed, none of the dissents cite an actual case from the common law era in which a prison official was ordered to pay damages after miscalculating the release date of a convicted prisoner.

True, the dissents go on to list a parade of horribles supposedly created by today's decision—or really by the enactment of section 669.23 over forty years ago. But in many of those situations, the prisoner would have a cause of action for damages under current Iowa law. For example, if a corrections officer deliberately beat a defenseless prisoner, they would not be acting within the scope of their employment and could be sued individually under Iowa law—as well as under 42 U.S.C. § 1983. *See, e.g.*, *Martin v. Tovar*, 991 N.W.2d 760, 763–64 (Iowa 2023) ("We will find an employee's conduct outside the scope of employment if it substantially diverges from conduct that the employer actually authorizes."); *Godfrey v. State*, 847 N.W.2d 578, 586 (Iowa 2014) ("[C]laims against the individual defendants in their individual capacities must proceed outside the Iowa Tort Claims Act until such time the fact finder establishes that at the time of the alleged actions, the individual defendants were acting within

the scope of their employment."). Obviously, those aren't the alleged facts of the present case.

Consider also Justice McDermott's claim that "as a policy matter, experience suggests that the republic will not fall" if state officials can be sued for damages for false imprisonment, given that municipal officials already can be sued. Justice McDermott has it backwards. He should be asking, "Has the republic fallen in the last 168 years when such suits have not been available?" Since it hasn't, we should be leaving this "policy matter" to the legislature.

**VI. The Dissents' Efforts to Reintroduce *Godfrey* by the Backdoor Would Be as Unworkable as *Godfrey* Was.**

The dissents acknowledge that a significant reason why we overruled *Godfrey* was its unworkability. *See Burnett*, 990 N.W.2d at 304–05 (discussing *Godfrey*'s unworkability). Justice McDonald acknowledges that *Godfrey* was "impractical." Justice McDermott describes it as "elusive in nature and scope." But the dissents fail to confront the same practical difficulties that permeate their own proposals.

To begin, under their approach, where would we find the common law? The dissents suggest we explore old treatises written by such worthies as William Blackstone, Edward Coke, Mathew Hale, and W.F. Maitland. But those venerable works don't cover this specific situation of a prisoner who sued for damages after being detained past his claimed release date.[7] So what common law do we refer to? Is it only Iowa common law? Do we retain our normal role as common law judges able to shape the common law?

---

[7]Reading the dissents, one gets the impression that late 18th and early 19th century Britain would have been very hospitable to Sikora's lawsuit. But during this time, even white males—the most privileged class in British society—were subject to forced impressment in the British Navy, debtors' prison if they didn't pay their bills, and permanent deportation to Australia if they committed a crime. It's all conjecture, but using novelists like Charles Dickens, George Eliot, and Herman Melville as my guide, I'd guess that Sikora's case would not get very far.

For example, false imprisonment is generally regarded as an intentional tort and is found in the so-called "intentional tort exception" to the ITCA. *See Minor v. State*, 819 N.W.2d 383, 406 (Iowa 2012); *see also Johannsen v. Steuart*, 152 N.W.2d 202, 206 (Iowa 1967) (rejecting negligence claim based on alleged nonfeasance in a false imprisonment case against a sheriff). Yet Justice McDonald would allow Sikora to proceed even on a negligence theory.

If the dissents became the law, we would also run into the question of how much the legislature could limit the false imprisonment tort. Justice McDonald acknowledges that the legislature could enact "reasonable" but not "illegitimate" or "oppressive" restrictions. That's not very helpful.

Justice McDermott says that the legislature may "regulate" the right to sue the IDOC director for false imprisonment but may not "foreclos[e]" it. Yet any regulation does some foreclosing.

Another issue would be that of qualified immunity. We grappled with this after *Godfrey. See Burnett*, 990 N.W.2d at 304–05. The legislature enacted a qualified immunity statute in the wake of *Godfrey*, which we have now held applies only to constitutional and statutory claims. *See Doe v. W. Dubuque Cmty. Sch. Dist.*, 20 N.W.3d 798, 806 (Iowa 2025). Presumably, the legislature would have to go back to the drawing board and enact a new qualified immunity statute to cover the dissenters' new causes of action. We would then have to decide if that law was "reasonable" or instead "illegitimate" and "oppressive."[8]

And where would the dissents lead? Could someone who pleaded guilty but was factually innocent and was later exonerated sue for false imprisonment?

---

[8]We would also need to decide the extent to which other immunities in Iowa Code chapter 669 might apply. *See Westfall v. State*, 337 P.3d 853, 858 (Or. Ct. App. 2014) (holding the discretionary function immunity—Oregon's counterpart to Iowa Code section 669.14(1)—applied to a prisoner's damages claim based on miscalculation of a release date).

*See Rhoades v. State*, 880 N.W.2d 431, 450–51 (Iowa 2016) (finding that such an individual could not recover damages under Iowa Code chapter 663A for wrongful imprisonment). What about someone who was jailed pending trial but later acquitted? After all, if the person is found guilty, they are billed for room and board. Maybe the dollars should go in both directions, depending on the outcome of the case. Many people would regard these two situations as more sympathetic than Sikora's. The possibilities for judicial creativity under the doctrines of "constitutional superstructure" and the "general law" are endless.

**VII. Conclusion.**

We made the correct decision in 2023 to overrule *Godfrey* and restore the situation as it was before *Godfrey* became temporarily the law in 2017. My dissenting colleagues would revive *Godfrey* in substance if not in name. For the reasons stated in the majority opinion, as well as those set forth above, the district court's order of dismissal should be affirmed.

Christensen, C.J., and Waterman, J., join this concurrence.

**McDonald, Justice (dissenting).**

Almost 250 years ago, our forefathers severed the legal relationship between America and Great Britain due to the king's "repeated injuries and usurpations" of their "unalienable Rights," including the right to "Life, Liberty and the pursuit of Happiness." The Declaration of Independence para. 2 (U.S. 1776). After seven years of bloody conflict, they gained their independence and established a new government; first, a failed confederation, and then a constitutional republic, ratified by the people, adopted to "secure the Blessings of Liberty to [them]selves and [their] Posterity." U.S. Const. pmbl. At the time of America's founding, those "unalienable Rights" and "Blessings of Liberty" arose out of and were secured by the common law. *Id.* At common law, those injured by government officials had the right to sue those same government officials for monetary damages and other relief. This common law regime of rights was codified as fundamental law in the structure and text of the Federal and State Constitutions, including the Iowa Constitution.

The State now claims that its officials can violate this fundamental law and imprison people with impunity. This "obliterates the line of demarcation that separates constitutional government from absolutism, free self-government based on the sovereignty of the people from that despotism . . . which enables the agent of the state to declare and decree that he is the state; to say '*L'Etat, c'est moi.*' " *Poindexter v. Greenhow*, 114 U.S. 270, 291 (1885).

When our forefathers fought and pledged their lives, fortunes, and sacred honor to establish a new nation, they did not intend to create absolutist federal and state governments whose officials had the authority to imprison them and their posterity with impunity. Not even King George III asserted such power for

his officials, and our forefathers attempted to make sure none could assert it here. They understood that tyranny authorized by statute is still tyranny.

I.

Sikora claims that the State and its officials imprisoned him for approximately five months longer than the law allowed, and he seeks compensation for that period of unlawful imprisonment or over-detention. In his first petition, he asserted constitutional torts and claims of negligence and negligence per se against the State of Iowa and Dr. Beth Skinner, as director of the Iowa Department of Corrections, in her official and individual capacity. Those counts were dismissed, and Sikora sought leave to amend his petition.

In his proposed amended petition, Sikora sought to add additional defendants: Jerry Bartruff, individually and in his capacity as director of the Iowa Department of Corrections; Dan Craig, individually and in his official capacity as interim director of the Iowa Department of Corrections; and Travelers Casualty & Surety Company of America. Sikora also sought to assert new claims: (1–3) violation of his rights to liberty, to be free from unreasonable seizures, and to have due process of law, as protected by article I, sections 1, 8, and 9 of the Iowa Constitution, respectively; (4–5) negligence and negligence per se; (6) false imprisonment; (7–8) declaratory relief related to the officer's oath and action on the officer's bond; and (9) trespass on the case.

The district court denied Sikora's motion for leave to amend his petition on the ground that the proposed amendment was futile. The court reasoned that Sikora's state constitutional claims failed as a matter of law after *Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023). The district court determined Sikora's common law claims were barred by the doctrine of sovereign immunity. The district court rejected Sikora's arguments that he would be entitled to

declaratory relief or could sue on the bond. Finally, the district court ruled that trespass on the case was an antiquated writ that could no longer be pursued as a separate cause of action.

The majority affirms the district court's denial of Sikora's motion for leave to amend on largely the same grounds. I agree with the majority's resolution of Sikora's claims except his claims for negligence, negligence per se, and false imprisonment against the individual defendants. At common law, the sovereign was immune from suit, but the sovereign's officials were liable for their conduct, including conduct taken in their official capacities. The government does have the authority to amend the common law, perhaps even extending the sovereign's immunity from suit and liability to its officers in certain circumstances. However, the government's extension of its immunity as sovereign to its officials is illegal and void where the immunity effects a deprivation of constitutional rights. I conclude that Iowa Code section 669.23 (2022)—extending the State's immunity—as applied to Sikora's claims for negligence, negligence per se, and false imprisonment is illegal and void because the extension of sovereign immunity to these government officials contravenes the structure and text of the state constitution.

II.

The doctrine of sovereign immunity cloaks the sovereign—the monarch or the government itself—with immunity from suit, but it has never been understood to shroud government officials. "The traditional law distinguished sharply between suits against the sovereign, in which sovereign immunity applied, and suits against government officials, who normally could not claim the sovereign's immunity when sued in their own names." Richard H. Fallon, Jr., *Constitutional Remedies: In One Era and Out the Other*, 136 Harv. L. Rev. 1300,

1312 (2023). Suits against government officials were quite common at common law, including claims for wrongful imprisonment or false imprisonment, and have persisted in federal and state courts since the time of America's founding.

A.

American constitutional law is "necessarily influenced by the fact" that our constitutions "are framed in the language of the English common law, and are to be read in the light of its history." *Smith v. Alabama,* 124 U.S. 465, 478 (1888).

At common law, it was understood that "the king can do no wrong." 1 William Blackstone, *Commentaries* *245–46. The "ancient and fundamental maxim [was] *not* to be understood, as if every thing transacted by the government was of course just and lawful." *Id.* Instead, it meant two things. "First, that whatever [was] exceptionable in the conduct of public affairs, [was] not to be imputed to the king . . . ." *Id.* at *246. This meant that the king, as sovereign, enjoyed immunity from suit for his own conduct and his officials' conduct. William Blackstone opined "that no suit or action [could] be brought against the king, even in civil matters, because no court [could] have jurisdiction over him." *Id.* at *242. "And, secondly, it mean[t] that the prerogative of the crown extend[ed] not to do any injury: it [was] created for the benefit of the people, and therefore [could not] be exerted to their prejudice." *Id.* at *246. The sovereign was "incapable of *doing* wrong" and "even of *thinking* wrong." *Id.*

Properly understood, the maxim "the king can do no wrong" imposed an *obligation* on the sovereign to make right any wrong done by him or his officials. "[T]o *know of* an injury and to *redress* it [were] inseparable in the royal breast," and the king was obligated to issue orders "in the king's own name . . . to his judges to do justice to the party aggrieved." 3 *id.* at *255 (emphasis added). As to

private injuries, such as the deprivation of liberty by wrongful imprisonment, an injured person could obtain relief in one of two ways.

First, the person could seek redress by petitioning the sovereign for "leave to enter an action against him." 1 *id.* at *243. No just ruler could refuse such a request. *See id.* at *246.

Second, the person could file suit against the offending government official. While the king could not be sued for whatever was "amiss in the conduct of public affairs, . . . his ministers [were] accountable for it to the people." 3 *id.* at *254–55; *see also Ex parte Cranman*, 792 So. 2d 392, 399–406 (Ala. 2000) ("In England, the doctrine that 'the king can do no wrong' came to be accompanied by the concept that his ministers were personally responsible when they acted illegally."); Matthew Hale, *On the Law of Nature, Reason, & Common Law* 206 (Gerald J. Postema ed., 2017) [hereinafter Hale, *On the Law*] ("While the king is immune from civil and criminal prosecution, his ministers may be denied legal cover for their actions" and be "liable to law's coercive power."); A.V. Dicey, *Introduction to the Study of the Law of the Constitution* 114 (Liberty Fund ed. 1982) ("A colonial governor, a secretary of state, a military officer, and all subordinates, through carrying out the commands of their official superiors, [were] as responsible for any act which the law does not authori[z]e as is any private and unofficial person." (footnotes omitted)); Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 1 (1963) [hereinafter Jaffe] ("From time immemorial many claims affecting the Crown could be pursued in the regular courts if they did not take the form of a suit against the Crown. . . . If the subject was the victim of illegal official action, . . . he could sue the King's officers for damages.").

The sovereign had no authority to shield government officials from private suits. Contrary to common belief, even monarchs were subject to limitation. The sovereign could not grant a "privilege . . . in any wise prejudicial to the commonwealth or a private person" because the "law [would] not suppose the king to have meant . . . an injurious action." 1 William Blackstone, *Commentaries* \*246. Any privilege or immunity that denied the right to redress was "rendered void" because "the law [would] not cast an imputation on that magistrate whom it intrusts with the executive power, as if he was capable of intentionally disregarding his trust." *Id.* Stated differently, "the prerogative of the crown extend[ed] not to do any injury: it is created for the benefit of the people, and therefore [could not] be exerted to their prejudice." *Id.*

Sir Matthew Hale, the Chief Justice of the Court of the King's Bench, explained:

> Yet nevertheless this directive power of the law hath this effect even as to the king's actions, that it doth *irritare actus contrarios legis directioni* [invalidate acts contrary to the requirements of law] in many cases. And therefore though the king in case of such acts done contrary to the directive power of the law is not subject to the coercive power of the law in respect of the sacredness and sublimity of his person, **the instruments and ministers that are the immediate actors of such unlawful things are subject to the coercive power of the law. For the king's act in such case being void doth not justify or defend the instruments. This is one of the principal reasons of the maxim in law that the king can do no wrong, for if it be wrong and contrary to the law, it is not the act of the king but of the minister or instrument that put it in execution and consequently such minister is liable to the coercion of the law to make satisfaction.**

Hale, *On the Law* at 221–22 (alteration in original) (emphasis added).

The rule of officer liability was demonstrated in the famous case of *Entick v. Carrington* (1765) 95 Eng. Rep. 807 (C.P.)—a case " 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted," *United*

*States v. Jones*, 565 U.S. 400, 405 (2012) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)). In that case, John Entick brought a trespass action against the king's chief messenger, Nathan Carrington, who "with force and arms" broke into Entick's home. *Entick*, 95 Eng. Rep. at 807. Carrington asserted that his actions were justified pursuant to a general warrant issued by Secretary of State Lord Halifax, which instructed Carrington "to make strict and diligent search for . . . the author, or one concerned in the writing of several weekly very seditious papers." *Id.* at 808. The court held the general warrant was "wholly illegal and void" and could not justify the trespass. *Id.* at 818. Entick recovered significant monetary damages against the messenger and the secretary of state. *See id.* at 811, 818. The same result was reached in a series of related cases. *See Money v. Leach* (1765) 97 Eng. Rep. 1075 (K.B.); *Entick v. Carrington* (1765) 19 How. St. Tr. 1029 (K.B.); *Wilkes v. Wood* (1763) 98 Eng. Rep. 489 (K.B.); *Huckle v. Money* (1763) 95 Eng. Rep. 768 (C.P.).

B.

The Supreme Court has described the *Entick* decision as a "monument of English freedom" and "the true and ultimate expression of constitutional law." *Boyd v. United States*, 116 U.S. 616, 626–27 (1886), *overruled in part on other grounds by*, *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967). It should come as little surprise, then, that the founders left in place the common law regime of rights as the foundation upon which the federal and state constitutional superstructures rested. It was incorporated as part of the "constitutional design." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 79 (2000) (quoting *Alden v. Maine*, 527 U.S. 706, 733 (1999)); *see also Hernandez v. Mesa*, 589 U.S. 93, 110 (2020) ("[T]he traditional way in which civil litigation addressed abusive conduct by . . . officers was by subjecting them to liability for

common-law torts."); *Alden*, 527 U.S. at 734 (explaining the nature and limits of "sovereign immunity are determined by the Founders' understanding"); *Belknap v. Schild*, 161 U.S. 10, 18 (1896) ("But the exemption of the United States from judicial process does not protect their officers and agents, civil or military, in time of peace, from being personally liable to an action of tort by a private person . . . ."); James E. Pfander & Rex N. Alley, *Federal Tort Liability After* Egbert v. Boule*: The Case for Restoring the Officer Suit at Common Law*, 138 Harv. L. Rev. 985, 1000 (2025) ("[T]he United States followed English courts in allowing individuals to sue officials at common law to ensure government accountability and the rule of law."); Sina Kian, *The Path of the Constitution: The Original System of Remedies, How It Changed, and How the Court Responded*, 87 N.Y.U. L. Rev. 132, 135 (2012) [hereinafter Kian] (explaining that the common law "was the original system of constitutional remedies, robust and undisputed in the antebellum Union"). Under this common law constitutional regime, "[t]hose who suffered a violation of their rights were able to bring suit, in common law or equity, against the responsible agent." Kian, 87 N.Y.U. L. Rev. at 135. If the agent's claimed justification or defense was itself unconstitutional, then the agent "would have no legally cognizable defense for violating the plaintiff's rights." *Id.*

1.

During the Virgina ratifying convention, future Chief Justice Marshall explained that the people need not fear abuse from federal officials because those officials were subject to suit and any attempt to immunize their conduct would be void:

> The federal sheriff, says he, will go into a poor man's house and beat him, or abuse his family, and the federal court will protect him. Does any gentleman believe this? Is it necessary that the officers will

commit a trespass on the property or persons of those with whom they are to transact business? **Will such great insults on the people of this country be allowable? Were a law made to authorize them, it would be void. The injured man would trust to a tribunal in his neighborhood. To such a tribunal he would apply for redress, and get it. There is no reason to fear that he would not meet that justice** . . . .

John Marshall, *Virginia Ratifying Convention* (June 20, 1788), *reprinted in 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 554 (Jonathan Elliot ed., 1836) (emphasis added).

Not many years later, then-Chief Justice Marshall expressly rejected the idea that the sovereign's immunity from suit could be extended to government officials: "If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).

Chief Justice Marshall then applied the rule of officer liability in two cases the following year. In *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 170 (1804), the President instructed the commander of a warship to seize a Danish vessel suspected of violating a nonintercourse law. The President misconstrued the statute, however, and the commander had no statutory authority to seize the vessel. *See id.* at 175–76. The owner of the vessel sued the commander for the unlawful seizure and was awarded $8,504 in damages. *Id.* at 175. In the Supreme Court, the commander argued that he could not be liable because he was acting under the color of law, specifically at the instruction of the President. *Id.* at 178–79. Chief Justice Marshall was leery of allowing damages in this context, writing, "I confess the first bias of my mind was very strong in favor of the opinion that though the instructions of the executive could not give a right,

they might yet excuse from damages." *Id.* at 179. Despite his "first bias," the Great Chief Justice concluded that the President's "instructions [could not] change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass." *Id.* The Supreme Court affirmed the damages award against the federal official. *Id.* Later that same year, in *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 124–26 (1804), the Supreme Court again affirmed a judgment against a naval officer arising out of the unlawful seizure of a vessel and its cargo.

Common law suits against federal officials were not limited to cases involving seizures of property. Federal officials routinely were sued for monetary damages for false imprisonment and could assert a defense of justification in response. In *Palmer v. Allen*, 11 U.S. (7 Cranch) 550, 563 (1813), a federal marshal was sued for false imprisonment after arresting the plaintiff on a writ sued out by the federal government. In *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 213 (1821), the Sergeant-at-Arms of the House of Representatives was sued for false imprisonment after executing a warrant issued by the Speaker of the House of Representatives. In *Mitchell v. Harmony*, 54 U.S. (13 How.) 115, 118, 128–29, 137 (1851), the Supreme Court affirmed a $90,806.44 award against an Army colonel who wrongly imprisoned a goods trader and seized his goods to support the advancing army during the Spanish–American War. In *Dinsman v. Wilkes*, 53 U.S. (12 How.) 390, 402–04 (1851), a captain in the military had to answer after he wrongfully imprisoned one of his soldiers.

There is no indication in the federal caselaw prior to the time of Iowa's founding that federal officials could assert the immunity of the federal government in response to a common law claim for false imprisonment. *See, e.g.*, *Dynes v. Hoover*, 61 U.S. (20 How.) 65, 77–78 (1857) (involving a suit against a

federal marshal); *Robinson v. Dow,* 1 Hay. & Haz. 239 (C.C.D.C. 1846) (affirming the plaintiff's verdict against a federal justice of the peace); *Nichols v. Burch,* 5 D.C. (5 Cranch) 553 (C.C. 1839) (involving a suit against federal constables); *Ingram v. Butt,* 4 D.C. (4 Cranch) 701 (C.C. 1836) (involving a federal official serving as the head of an asylum); *Ryan v. Ringgold,* 3 D.C. (3 Cranch) 5 (C.C. 1826) (involving a suit against a federal marshal); *Neale v. Minifie,* 2 D.C. (2 Cranch) 16 (C.C. 1810) (involving a suit against a federal justice of the peace); *Wilson v. Marshal of the D.C.,* 1 D.C. (1 Cranch) 608 (C.C. 1809) (involving a suit against a federal marshal).

2.

Like federal officials, state and local officials were also subject to suit for monetary damages. *See Bonner v. State ex rel. Pitts,* 7 Ga. 473, 481 (1849) ("Every officer, from the highest to the lowest, in our government, is amenable to the laws of his country, for an injury done to individuals, either by a violation of them, by acts of commission, or refusing to do that which the laws enjoin upon him as a duty."). There is no evidence in the caselaw prior to Iowa's admission to statehood that state or local officials could assert the immunity of the state, as sovereign, to avoid liability for claims of false imprisonment or false arrest. *See, e.g., Plummer v. Jarvis,* 23 Me. 297, 300–01 (1843) (involving a suit against a state land agent for false imprisonment and trespass after the state land agent arrested the plaintiff and took his property); *Barker v. Stetson,* 73 Mass. (7 Gray) 53, 54 (1856) (allowing a claim to be asserted against a magistrate and arresting officer); *Munroe v. Merrill,* 72 Mass. (6 Gray) 236, 238–39 (1856) (allowing a suit against an arresting officer); *Grinnell v. Phillips,* 1 Mass. (1 Will.) 530, 534–37 (1805) (involving a claim against a sheriff), *overruled on other grounds by, Woodward v. Leavitt,* 107 Mass. 453 (1871); *Williams v. Garrett,* 12 How. Pr.,

How. Pr. (n.s.) 456, 456–57 (N.Y. Sup. Ct. 1856) (affirming the plaintiff's verdict for $50 against a constable); *Isaacs v. Camplin*, 17 S.C.L. (1 Bail.) 411, 412 (1830) (allowing a suit against a constable).

3.

Iowa followed the general rule of sovereign immunity but officer liability. In an early case, this court explained that the king can do no wrong "does not mean that the king or government is incapable of doing an act for which a subject should have redress." *Metz v. Soule, Kretsinger & Co.*, 40 Iowa 236, 239 (1875). Instead, it meant that the sovereign had an obligation to redress any wrong brought to its attention—"the king has no right to do a wrong." *Id.* In Iowa, an injured party could seek redress by petitioning for relief or by bringing a suit against the offending state or local official. *See Segura v. State*, 889 N.W.2d 215, 220–21 (Iowa 2017); *Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013).

In Iowa, wrongfully arrested or imprisoned persons frequently brought suits against government officers and employees for false arrest and false imprisonment. In the early case of *Hutchinson v. Sangster*, 4 Greene 340, 341–42 (Iowa 1854), the plaintiff was arrested for being intoxicated in public. Like Sikora, the plaintiff claimed he was detained too long. *Id.* The plaintiff sued a local marshal for false imprisonment. *Id.* at 340. The suit was allowed to proceed, although the marshal was held not liable because the length of detention was justified. *Id.* at 342. *Hutchinson* was just the first of many claims of wrongful imprisonment and false imprisonment brought against Iowa government officials. *See, e.g.*, *Johannsen v. Steuart*, 152 N.W.2d 202, 203–04 (Iowa 1967) (involving a sheriff); *McVay v. Carpe*, 29 N.W.2d 582, 582–84 (Iowa 1947) (involving police detectives); *Andersen v. Spencer*, 294 N.W. 904, 904–05 (Iowa 1940) (involving a mayor and deputy marshal); *O'Neill v. Keeling*, 288 N.W. 887,

887 (Iowa 1939) (involving a sheriff and his surety); *Norton v. Mathers*, 271 N.W. 321, 321 (Iowa 1937) (involving a sheriff and his bonding company); *Schultz v. Enlow*, 205 N.W. 972, 972 (Iowa 1925) (involving a mayor and city marshal); *Scott v. Feilschmidt*, 182 N.W. 382, 383–85 (Iowa 1921) (allowing damages against an officer and a bonding company following the arrest of a girl who talked "saucily" to the officer and called him a "big prune"); *Comstock v. Md. Cas. Co. of Balt.*, 179 N.W. 962, 962–63 (Iowa 1920) (involving a suit against an officer and bonding company); *Foft v. Hamilton*, 153 N.W. 146, 147–48 (Iowa 1915) (affirming an award against a mayor); *McGrew v. Holmes*, 124 N.W. 195, 195 (Iowa 1910) (involving a case against a mayor, marshal, and bonding company); *Kirby v. Harker*, 121 N.W. 1071, 1071 (Iowa 1909) (involving a suit against a mayor for an allegedly illegal quarantine); *Heath v. Hagan*, 113 N.W. 342, 343 (Iowa 1907) (involving a suit against a police officer); *Snyder v. Thompson*, 112 N.W. 239, 240–41 (Iowa 1907) (involving a mayor and city marshal), *overruled in part on other grounds by*, *Young v. City of Des Moines*, 262 N.W.2d 612 (Iowa 1978) (en banc), *overruled by*, *Parks v. City of Marshalltown*, 440 N.W.2d 377 (Iowa 1989); *Young v. Gormley*, 94 N.W. 922, 922, 925 (Iowa 1903) (affirming a verdict against a mayor and city marshal); *Stewart v. Feeley*, 92 N.W. 670, 671 (Iowa 1902) (involving a suit against a police officer).

C.

The relevant precedents conclusively establish that the maxim "the king can do no wrong" shielded only the king from suit and from liability. The king's ministers, officers, and employees were subject to suit for their conduct, including conduct within the scope of their employment. This common law regime of sovereign immunity but officer liability was imported to America and served as the foundation of this nation's constitutional superstructure.

III.

The majority and concurrence misunderstand the traditional law of sovereign immunity. The majority and concurrence acknowledge that there have been many suits seeking monetary damages against government officials, but the majority and concurrence make a distinction between state officials and municipal officials. It appears the majority and concurrence believe that the state government's immunity from suit has always extended to state officers and employees, who never have been and who never could be subject to suit without the sovereign's consent. It appears the majority and concurrence also believe that the state government's immunity from suit never extended to municipal officials, who always have been and always will be subject to suit unless the state government extends its immunity to them. The only support for this proposition is a single statement in *Wagner v. State*, 952 N.W.2d 843, 856 (Iowa 2020). That statement in *Wagner* is not controlling here. It was dicta, and it was erroneous dicta, as Justice Oxley thoroughly explains in her separate opinion filed today, which I join. I would add just a few additional points to her excellent discussion.

As a matter of legal doctrine, the special status the majority and concurrence afford state officials within our constitutional system does not make sense. What logical distinction would provide state officials immunity superior to federal and local officials? I cannot think of one, *see* Jaffe, 77 Harv. L. Rev. at 23 ("Furthermore, no distinction has ever been explicitly recognized in the cases between suits against state and against federal officers, since rationalization has proceeded in terms of an abstract sovereign equally applicable to both types of case."), and the majority and concurrence have not offered one. I suggest that the majority and concurrence have not offered one because there is no such distinction recognized in the caselaw.

The majority and concurrence's claim that state officials possess special sovereign immunity that federal officials and municipal officials lack is at odds with the Supreme Court's understanding of sovereign immunity. *See Cent. Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 360 (2006) (stating that only "arm[s] of the State" are entitled to assert sovereign immunity (alteration in original)); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 272 (1997) ("In other words, where the individual would have been liable at common law for his actions, sovereign immunity was no bar regardless of the person's official position."); *Scheuer v. Rhodes,* 416 U.S. 232, 238 (1974) ("[D]amages against individual defendants [state officials] are a permissible remedy in some circumstances notwithstanding the fact that they hold public office."), *abrogated on other grounds by, Davis v. Scherer,* 468 U.S. 183 (1984); *Tindal v. Wesley,* 167 U.S. 204, 220 (1897) (stating that suits for "compensation for damages" against "defendants who claim to act as officers of a state" are not "an action against the state" (quoting *Ex parte Tyler,* 149 U.S. 164, 190 (1893))); *Scott v. Donald,* 165 U.S. 58, 67–70 (1897) (rejecting a sovereign immunity defense raised by a state officer and stating that "where a suit is brought against defendants, who claim to act as officers of a state, and, under color of an unconstitutional statute, commit acts of wrong and injury to the property of the plaintiff, to recover money or property in their hands unlawfully taken by them in behalf of the state, or for compensation for damages, such suit is not, within the meaning of the amendment, an action against the state"); *Robertson v. Sichel,* 127 U.S. 507, 516 (1888) (explaining that in an action for money damages that each officer "is responsible for his own negligence only, and not for that of any of the others, although selected by him and subject to his orders" (quoting *Keenan v. Southworth,* 110 Mass. 474, 474–75 (1872))).

According to the Supreme Court, a suit against a state official in the official's personal capacity does not implicate or infringe the state's dignitary interest as sovereign because the state has no obligation to pay damages on behalf of the employee. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Whether a suit is against the state official in the official's personal capacity turns on "the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Id.* at 26. "[T]he dispositive inquiry is 'who will pay the judgment?' " *Stafford v. Briggs,* 444 U.S. 527, 542 n.10 (1980). Where the plaintiff seeks damages from the individual defendant rather than the state treasury, the state official is sued in his or her individual capacity, regardless of whether the state chooses to indemnify the official. *See Alden*, 527 U.S. at 757 ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally."); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.").

The majority and concurrence's assertion that there is special sovereign immunity for state officials is also contrary to persuasive state authority. In addition to the cases discussed above, see *State Road Dep't v. Tharp*, 1 So. 2d 868, 869 (Fla. 1941) (en banc) ("Immunity of the State from suit does not afford . . . a State officer relief for trespassing on the rights of an individual even if he assume to act under legal authority."); *Fla. State Hosp. for Insane v. Durham Iron Co.,* 17 S.E.2d 842, 845–46 (Ga. Ct. App. 1941) (allowing a claim against a state official "based on the theory that the constitutional guarantee to the citizen would prevail over the wrongdoing of the State officials, even though the rights

of the citizen had been invaded by the officer in the name of and for the benefit of the sovereign State, notwithstanding the immunity from suit of the sovereign State"), *rev'd*, 21 S.E.2d 216 (Ga. 1942); *Heiser v. Severy*, 158 P.2d 501, 504 (Mont. 1945) (stating that the state's immunity from suit does not extend to state officials and that "the citizen is allowed a remedy against the wrongdoer personally" (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 462 (1945))); *McClain v. State*, 223 N.E.3d 361, 365 (Ohio 2022) ("While the common law sometimes allowed plaintiffs to bring false-imprisonment claims against state officials, it did not permit suits against the state itself.") (emphasis omitted) (citations omitted); *Copeland v. Boone*, 866 S.W.2d 55, 58 (Tex. Ct. App. 1993) ("Historically, this doctrine, as its name implies, shields the sovereign from liability. Where the question concerns the liability of a governmental officer or employee, rather than the liability of the sovereign itself, the problem is one of official immunity, not sovereign immunity." (quoting *Baker v. Story*, 621 S.W.2d 639, 643 (Tex. Civ. App. 1981))).

And controlling here, the majority's distinction between state and local officials is contrary to Iowa law. This court has long held that "agencies of the state" could not be sued for the "illegal acts of its agents" but that the individual agents could be sued. *A'hern v. Iowa State Agric. Soc.*, 58 N.W. 1092, 1093 (Iowa 1894); *see also Segura*, 889 N.W.2d at 220–21 ("[O]ne who suffered damages as the result of a negligent or wrongful act of a State employee had the limited choice of bringing suit against the employee personally or seeking redress from the Iowa General Assembly in the form of private relief." (quoting Don R. Bennett, *Handling Tort Claims and Suits Against the State of Iowa: Part I*, 17 Drake L. Rev. 189, 189 (1965) (footnotes omitted))). Indeed, members of today's majority and the author of the concurrence previously have asserted this was a correct

statement of the law. *See Godfrey v. State*, 898 N.W.2d 844, 894 (Iowa 2017) (Mansfield, J., dissenting, joined by Waterman, J.) (stating that "one who suffered damage as the result of a . . . wrongful act of a State employee" could "bring[] suit against the employee personally" (quoting Bennett, 17 Drake L. Rev. at 189)), *overruled by*, *Burnett*, 990 N.W.2d 289. The members of the majority and concurrence offer no explanation for their about-face today.

Rather than directly addressing their own prior statements of law and the relevant cases, the majority blames Sikora, stating, "Sikora has cited no pre-[Iowa Tort Claims Act (ITCA)] cases allowing tort claims for money damages against *state* officials." This is willful ignorance. In addition to the cases discussed above, here are a few more. In *Coleman v. Tierney*, 165 N.W. 41, 41 (Iowa 1917), the plaintiff was arrested by a state game warden, and the plaintiff sued the warden for false arrest. Because the arrest was made without a warrant, "the burden of proof [was] placed upon the defendant in th[e] case to prove by the preponderance [of the evidence] . . . he was justified in doing what he did in arresting the plaintiff. To do this he [had to] establish by the preponderance of the evidence, that the plaintiff, at the time of his arrest, was found in the act of violating some law enacted for the propagation and protection of fish." *Id.* at 41–42. If the state official failed to prove his justification defense, "then the plaintiff [was] entitled to recover of the defendant the damages which he has suffered because of his arrest." *Id.* at 42. The jury initially returned a verdict against the state official for $175, but, on appeal, this court concluded that the plaintiff failed to prove his case and reversed the judgment. *Id.* at 41–42. Although the plaintiff failed to prove his case on the merits, the state official nonetheless was subject to suit for damages. *See id.*

Later, in *Burris v. Titzell*, 177 N.W. 557, 558–59 (Iowa 1920), the plaintiff sued a doctor employed by the University of Iowa for malpractice. In another suit involving a state university, the plaintiff sued four employees of the University of Northern Iowa for illegally deducting money from her final paycheck. *Marquart v. Maucker*, 184 N.W.2d 684, 684–85 (Iowa 1971). The defendants invoked the ITCA (then codified at chapter 25A), arguing that the "plaintiff's suit is really against the State, which is immune from such action except as permitted under chapter 25A." *Id.* at 685. This court rejected the argument, stating, "While the State is immune from suit except pursuant to a statute waiving its immunity, the same cannot be said for agents or employees of the sovereign. A defendant is not excused for malicious or negligent conduct simply because he works for the State." *Id.* We acknowledged that no judgment could be entered against the state but concluded that the claims against state employees could proceed. *Id.* at 685–86.

The majority does not cite or discuss *Marquart v. Maucker*, 184 N.W.2d 684, but the case is particularly important in understanding the historical scope and application of the sovereign immunity doctrine in Iowa and why the court's distinction between state and local officials is erroneous. The common law constitutional rule was that the sovereign—the government entity itself—was immune from suit but its officers and employees were subject to suit for monetary damages. The ITCA was passed and went into effect in 1965. *See* 1965 Iowa Acts ch. 79 (originally codified at Iowa Code ch. 25A (1966), now codified as amended at Iowa Code ch. 669 (2022)). The ITCA waived the state's immunity from suit, with certain exceptions. *Id.* §§ 4, 14. The ITCA, as originally enacted, contained no provisions that substituted the state as a party for state employee defendants or that extended the state's immunity, as sovereign, to state

employee defendants. *See id. Marquart* was decided in 1971, six years after the passage of the ITCA. Because the statute contained no provision substituting the state as a party or extending the state's immunity to the defendant employees, the *Marquart* court applied the common law constitutional rule that the defendants could be sued for monetary damages. 184 N.W.2d at 685–86. In other words, in the absence of a statutory provision to the contrary, the default rule in Iowa was that state officers and employees were subject to suit for monetary damages. It was only some years after the *Marquart* decision that the state legislature amended the ITCA and added a provision that extended the state's immunity as sovereign to individual employees. *See* 1984 Iowa Acts ch. 1259, § 4 (originally codified at Iowa Code § 25A.23 (1985), now codified as amended at Iowa Code § 669.23 (2022)). That provision provided that "[e]mployees of the state are not personally liable for any claim which is exempted under section 25A.14." *Id.*

In sum, there is no logical, doctrinal, or caselaw support for the distinction the majority and concurrence draw between federal and municipal officials on the one hand and state officials on the other. At common law and under this nation's traditional law, all government officials were subject to suit for the violation of private rights, including suits for wrongful or false imprisonment.

IV.

The majority and concurrence's misunderstanding of the traditional law of sovereign immunity distorts their analyses of the real legal issue in this case. The real legal issue in this case is whether the state can change the common law constitutional regime of rights and remedies and extend its immunity, as sovereign, to state employees to bar Sikora's common law claims arising out of

the deprivation of his liberty due to an alleged over-detention. *See* Iowa Code § 669.23. For the reasons expressed below, I conclude it cannot do so.

A.

The Iowa Constitution of 1857 is "the supreme law of the state." Iowa Const. art. XII, § 1. It was drafted and adopted at a specific time in a specific legal context of "preexisting principles, statutes, precedents, customs, and practices that gave meaning and operational effect to the text." *Lennette v. State*, 975 N.W.2d 380, 403 (Iowa 2022) (McDonald, J., concurring). Within that context, the law of the constitution, as established at the time it was adopted, remains the supreme law of this state until changed through the amendment process. *See Hunter v. Colfax Consol. Coal Co.*, 154 N.W. 1037, 1047 (Iowa 1915) ("The age of the Constitution may develop conditions which make it desirable to amend it; until amended, it is a holy covenant . . . ."). Francis Springer, the president of the 1857 Constitutional Convention of the State of Iowa, opened the convention with remarks explaining this fundamental principle:

> The constitution of a State may be regarded, to a certain extent, as a fixed and permanent instrument, a higher law, for the guidance, not only of individual members of the body politic, but also a law to which the various departments of the government, in their action, must conform. It is the foundation upon which the superstructure of the legislation and jurisprudence of the State rests. . . . It is looked upon as embodying the spirit and policy of a people. It is in a word "positive law."

1 *The Debates of the Constitutional Convention of the State of Iowa* 6–7 (W. Blair Lord rep., 1857) [hereinafter *The Debates*].

B.

The extension of the state's immunity, as sovereign, to its employees to bar claims for false imprisonment (or, stated more accurately, the creation of

state officer immunity to bar claims for false imprisonment) violates both the original structure and text of the state constitution.

1.

The immunity created by section 669.23 is at odds with the state constitution's original structure. The original law of sovereign immunity was that the state could not be sued for monetary damages without its consent but state and local officials could be and routinely were. The state constitutional superstructure was built upon this common law foundation:

> The framers of the 1857 Iowa Constitution expected it to be enforceable through tort. At the constitutional convention, a delegate proposed an amendment authorizing suits against the state for money damages if it revoked previously granted privileges or immunities. The proposal was designed to fill a narrow gap in the preexisting remedial scheme: under the historical system of constitutional tort, Iowa officers acting in an official capacity could not be held individually liable for the state's breach of contract. The state, not its agents, was the principal in any contractual agreement. Because the state was immune to suit, plaintiffs were simply out of luck. Thus, the first notable thing about the delegate's proposal is that it addressed the major hole in the traditional system. The inference is that the delegates presumed conventional tort law would provide remedies for most other constitutional violations.

> Furthermore, the convention rejected the proposal because it abrogated sovereign immunity, not because it created a constitutional remedy. The proposal proved unpopular. Delegates called it "injurious," "unnecessary," and (somewhat dramatically) "monstrous." Though they opposed the amendment, the delegates did not oppose enforcement of the constitution through tort actions for damages. Instead, their primary criticisms were that the proposal was "liable to get the State into an innumerable number of law suits" and impliedly authorized the legislature to make and break contracts at will. But the fundamental idea, that the appropriate remedy for the violation of a vested constitutional right was a suit for damages, was uncontroversial.

Recent Case, Burnett v. Smith, *990 N.W.2d 289 (Iowa 2023)*, 137 Harv. L. Rev. 1026, 1032–33 (2024) [hereinafter Recent Case] (footnotes omitted); *see also*

*Burnett*, 990 N.W.2d at 296 (discussing the 1857 debates and the original regime of rights). "The traditional structure of an action in constitutional tort was tripartite. Plaintiffs would sue government officers under conventional tort causes of action, those officers would raise public-justification defenses, and then plaintiffs would introduce the alleged constitutional violation as a limitation on that defense." Recent Case, 137 Harv. L. Rev. at 1026 (footnotes omitted).

The original constitutional structure of rights and remedies is just as important to the protection of liberty as the individual rights provisions contained in article I of the Iowa Constitution. Indeed, common law torts and the rights enumerated in article I are interwoven and mutually reinforcing. The customary common law scheme of tort suits for the reparation of various harms established the parameters of the legal obligations the members of the community, including government officials, owed to each other. In other words, the customary tort regime, case by case, gave rise to doctrine, then obligations, then expectations, and then rights, which, in America, ultimately gave rise to constitutionally enumerated rights. The entire constitutional regime "short-circuits if the government and its officers are immune from tort liability." Recent Case, 137 Harv. L. Rev. at 1026.

2.

In addition to razing the state constitutional structure of rights and remedies, Iowa Code section 669.23, as applied to bar claims against state officials for false imprisonment and over-detention, violates the text of the state constitution.

Iowa Constitution article I, section 1, provides that "[a]ll men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty." This inalienable rights

clause "secure[s] to the people of Iowa common law rights that pre-existed Iowa's Constitution." *Atwood v. Vilsack*, 725 N.W.2d 641, 651 (Iowa 2006); *see also Gray v. Oliver*, 943 N.W.2d 617, 629–31 (Iowa 2020) (explaining that article I, section 1 protects preexisting common law rights); *Midwest Check Cashing, Inc. v. Richey*, 728 N.W.2d 396, 403 (Iowa 2007) (explaining that the inalienable rights clause secured preexisting common law rights); *Ex parte Holman*, 28 Iowa 88, 128 (1869) (stating that there is an "inalienable right" "to the liberty of the common law"). The inalienable rights clause is not a "mere glittering generality without substance or meaning." *State v. Osborne*, 154 N.W. 294, 300 (Iowa 1915). Instead, it is "to be enforced by the judiciary." *Hoover v. Iowa State Highway Comm'n*, 222 N.W. 438, 439 (Iowa 1928) (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)).

The right to be enforced in this case is the inalienable right to common law liberty. The common law preserved "the personal liberty of individuals." 1 William Blackstone, *Commentaries* *134. "This personal liberty consist[ed] in the power of locomotion . . . or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint . . . ." *Id.* It was a "right strictly natural" that "[could not] ever be abridged at the mere discretion of the magistrate." *Id.* The "violation of the right of personal liberty" was "effected by the injury of false imprisonment." 3 *id.* at *127. A person who was falsely imprisoned was legally entitled to "private reparation." *Id.* The wrongfully imprisoned party had the right to "subject[] the wrongdoer to a civil action, on account of the damage sustained by the loss of time and liberty." *Id.* At common law, the cause of action for false imprisonment was part and parcel of the right to be free from unlawful imprisonment.

While the inalienable rights clause is judicially enforceable, its restrictions are not absolute. *See Atwood*, 725 N.W.2d at 651–52. The common law rights secured by the inalienable rights clause are subject "to such reasonable regulations as the peace, comfort, and welfare of society may demand." *Osborne*, 154 N.W. at 300. Reasonable regulations of the right include those laws that advance the legitimate ends of government and that use only those "means . . . reasonably necessary for the accomplishment of the purpose" and that are "not unduly oppressive upon individuals." *Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995) (quoting *Lawton v. Steele*, 152 U.S. 133, 137 (1894)). A law that infringes upon common law rights cannot be considered a "reasonable regulation" of the right where the law is "prohibitive, oppressive or highly injurious." *Steinberg–Baum & Co. v. Countryman*, 77 N.W.2d 15, 18–19 (Iowa 1956); *see also Osborne*, 154 N.W. at 300.

The extension of the state's immunity, as sovereign, to its employees to bar claims of false imprisonment is an illegitimate end. While many have disputed, and will continue to dispute, what constitutes "liberty" within the meaning of article I, section 1, there can be no dispute that the liberty of locomotion and the liberty to be free from unlawful imprisonment is the heart of constitutional liberty. Allowing state officials to imprison people with impunity would put "an end of all other rights and immunities." 1 William Blackstone, *Commentaries* *135. The "confinement of the person . . . where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government." *Id.* at *136.

Even if the State had some legitimate interest in limiting the liability of its employees for their tortious conduct, its chosen means in this case—the total elimination of any right of recovery for wrongfully imprisoned people—is unduly

oppressive and thus constitutionally forbidden. Article I, section 9 of the Iowa Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law." The due process clause was intended to provide "Americans at least the protection against governmental power that they had enjoyed as Englishmen against the power of the Crown." *Ingraham v. Wright*, 430 U.S. 651, 672–73 (1977). "Among the historic liberties so protected *was a right to be free from and to obtain judicial relief*, for unjustified intrusions on personal security." *Id.* at 673 (emphasis added). This included the freedom from "bodily restraint." *Id.* at 673–74. Constitutional due process for an alleged violation of the freedom from bodily restraint requires something more than the total lack of process effected by the ITCA.

## C.

The defendants, the majority, and the concurrence appear to be of the view that the original regime of rights and remedies and the text of the constitution has no legal significance and the state, as sovereign, has absolute authority to extend its immunity to whomever however and whenever it sees fit. This maximalist view of sovereign authority was rejected centuries ago.

It was widely believed at common law that "there [could] be no qualifications or modifications of the power of a sovereign prince." Hale, *On the Law* at 199. The sovereign "may make, repeal, and alter what laws he please." *Id.* Chief Justice Hale concluded that these "wild propositions" were "(1) utterly false, (2) against all natural justice, (3) pernicious to the government and governor, (4) destructive to the common good and safety of the governed, [and] (5) without any shadow of law or reason to support them." *Id.* (alteration in original). The king was not at liberty to suspend his subjects' liberties. "[S]uch a

doctrine as this as much weakens the sovereign power as is imaginable and betrays it with a kiss." *Id.* at 203.

Chief Justice Hale's criticism of absolute rule has greater strength in a constitutional republic. In our constitutional republic, sovereignty is split, and no government entity or person can lay claim to complete authority. Sovereignty is first divided between the people and the government. The people are the political sovereign, and the state is the legal sovereign. The people, as the political sovereign, created the government "for the protection, security, and benefit of the people." Iowa Const. art. I, § 2. To permanently restrain the limits of the legal sovereign, our founders, the people, enacted positive restrictions on the power of the government in the organic document constituting the government, the state constitution. The "various departments of the government . . . must conform" to the constitution and not vice versa. 1 *The Debates* at 6–7.

The defendants' claim of sovereign immunity in this case is nothing more than an assertion that the government and its officials have the unilateral right to alter the state constitution through normal legislation and wrongly imprison people without being held to account. That assertion is odious and repugnant to republican constitutional order. The state has a duty to protect the liberty of its people, not destroy it. *Holman*, 28 Iowa at 128 ("No more important duty and binding obligation are imposed upon the State than of guarding and protecting the liberty of the people."). "As far back as the Ordinance of 1787, the people were guaranteed 'judicial proceedings according to the course of the common law.' That guaranty has been perpetuated in one [form] or another in every expression of sovereign authority of the state down to the present time, and surely it is not only loyal obedience to the ultimate authority, but wise public policy, for the courts to resist every tendency to disregard it." *Fleming v. Merchs.'*

*Life Ins.*, 188 N.W. 703, 706 (Iowa 1922), *overruled on other grounds by, Lunt v. Grand Lodge, Ancient Ord. United Workmen of Iowa*, 229 N.W. 323 (Iowa 1929).

D.

Where, as here, a person's constitutional right to liberty—to be free from unlawful bodily restraint—has allegedly been violated, the extension of the state's sovereign immunity to the allegedly offending officials (or the creation of officer immunity) to preclude any potential claim for violation of that right is unduly oppressive and constitutionally forbidden. *See Lennette*, 975 N.W.2d at 402–03 (stating that, to protect constitutional rights, "[t]he Iowa Constitution secures a right to assert nonconstitutional causes of action for money damages against government officials" (McDonald, J., concurring)); *see also Corum v. Univ. of N.C.*, 413 S.E.2d 276, 292 (N.C. 1992) ("Furthermore, this Court has long held that when public officials invade or threaten to invade the personal or property rights of a citizen in disregard of law, they are not relieved from responsibility by the doctrine of sovereign immunity even though they act or assume to act under the authority and pursuant to the directions of the State."); Recent Case, 137 Harv. L. Rev. at 1030 ("Traditionally, plaintiffs vindicated both state and federal constitutional rights by suing under a common law cause of action. The officer would claim that his conduct was a justifiable exercise of state power, and the plaintiff would introduce the constitutional violation as a limit on that defense. Plaintiffs did not sue directly under the constitution because they did not need to; the common law was enough to get the constitutional claim into court." (footnotes omitted)). I cannot join the majority's disregard for the state constitution. I would hold that Sikora's motion for leave to amend his petition was not futile and that the district court abused its discretion in denying the motion. I would hold that Sikora can assert claims for negligence, negligence per

se, and false imprisonment against the individual defendants in their individual capacities.

## V.

Although I would hold that Sikora should be allowed to proceed with his common law claims for negligence, negligence per se, and false imprisonment against the individual defendants, I concur with the court that Sikora cannot assert constitutional tort claims for the alleged violations of article I, sections 1, 8, and 9 of the Iowa Constitution. While the state constitution secures the right to assert common law causes of action for violations of constitutional rights by negating certain defenses and justifications, it is not a font of constitutional tort law in and of itself.

## A.

As a general matter, there are at least two not-necessarily mutually exclusive conceptions of constitutional law within our republic. One conception is a nullification framework. Within that framework, a party may contend that some law cannot be enforced against the party or that some law cannot be asserted as a defense or justification to a claim because the law would be unconstitutional and void as applied in that case. This nullification framework arises out of the hierarchal nature of law and is nothing more than a court giving legal effect to a superior law—a constitution—when the superior law conflicts with an inferior law as applied in a particular case. *See Marbury*, 5 U.S. (1 Cranch) at 177–78; *see also* Iowa Const. art. XII, § 1 ("This Constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void."); *Godfrey*, 898 N.W.2d at 883 (Mansfield, J., dissenting) ("On the negative side, the constitution is a brake that invalidates contrary laws."). A second conception is a duty-based framework. Within that framework, the constitution

creates affirmative duties imposed on government officials, and a party can file a constitutional tort against an offending government official for violation of those affirmative duties. *See Godfrey*, 898 N.W.2d at 847–48. The failure of courts to clearly identify these different conceptions of constitutional law and reconcile them has been one of the main, perhaps the main, sources of tension and confusion in modern constitutional jurisprudence.

B.

With respect to federal law, these two competing conceptions of the constitution openly clashed in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In that case, the plaintiff asserted a Fourth Amendment tort claim against six federal agents arising out of an allegedly unlawful search and seizure. *Id.* at 389–90. The defendants rejected the plaintiff's duty-based conception of the Constitution. *See id.* at 390–91. The federal government, on behalf of the agents, argued the Fourth Amendment only worked to negate defenses to common law causes of actions asserted against government officials:

> The Fourth Amendment had its genesis in the successful common law actions in trespass prosecuted in England against government officers who offered the defense of justification by reason of a general warrant. The English courts disallowed the defense by holding the warrants void. **These cases indicate that the purpose of the Fourth Amendment was to insure that similar defenses would be disallowed in state common law actions. The fact that no general federal question jurisdiction was granted to the lower federal courts confirms that the Fourth Amendment was intended to affect only the defense in suits under state common law, not to create a wholly new federal tort action.**

Brief for the Respondents, *Bivens*, 403 U.S. 388 (No. 301), 1970 WL 122211, at *4 (emphasis added). The federal government further explained the historically

correct relationship between common law causes of action and the constitutional limitations on defenses to the same:

> Against this background of English law, which remained vivid in the minds of the Framers, it is not at all surprising that there is nothing in the Fourth Amendment to indicate that a new, *federal* cause of action for damages was being created. **In America, as in England, government officers were to be subject to the same common-law actions for damages as those applicable to private persons. And the Fourth Amendment insured that when the Amendment's proscriptions had not been followed, the officers would be precluded from justifying an infringement made actionable by *state* common law.**
>
> If the intention were otherwise—if a new federal action for damages were contemplated—it is difficult to understand why the lower federal courts were given no power over cases arising under the Constitution. On the other hand, if the purpose of the Fourth Amendment was to foreclose the defense of justification in common law actions there was good reason for trying such cases in state courts. **The right of action would be governed by state common law and although the Fourth Amendment would determine the federal officer's defense, it could be assumed that state courts would be alert to invalidate any unconstitutional exercise of federal power against the citizens of their state.**

*Id.* at *10–11 (footnotes omitted) (emphases added).

The Supreme Court rejected the government's argument and held that the plaintiff could assert a Fourth Amendment tort claim. *Bivens*, 403 U.S. at 397. However, the Court did not resolve the conceptual disagreement underlying the parties' arguments. The Court did not dispute the government's interpretation of the Fourth Amendment. Instead, the Court acknowledged the bona fides of the common law regime of rights and remedies but also concluded that constitutional torts should be superadded to that regime. *See id.* at 395–97. In the Court's view, the conceptual choice was not "either-or" but "both-and."

The Supreme Court's experiment with constitutional tort litigation proved short-lived, for all practical purposes. Post-*Bivens*, the Court recognized a tort

for sex discrimination arising under the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 231, 248–49 (1979), and a tort for inadequate care of a prisoner arising under the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 16–18 (1980). On eleven other occasions, the Court declined to create new constitutional torts. *See Egbert v. Boule*, 596 U.S. 482, 486 (2022) (citing cases). Although the Court has not explicitly overruled *Bivens*, it has implicitly done so, explaining that it has moved past "the heady days in which th[e] Court assumed common-law powers to create causes of action." *Id.* at 491 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring)); *see also id.* at 504 (Gorsuch, J., concurring in the judgment) (acknowledging that *Bivens* has been implicitly overruled and stating he would "acknowledge explicitly what the Court leaves barely implicit").

While the Court has interred *Bivens* and the duty-based conception giving rise to constitutional tort litigation, it has not yet fully returned to the historically and legally sound nullification-based conception of constitutional law, at least not with respect to the review of defenses and justifications interposed in response to common law causes of action asserted against government officials. In this regard, the Court has effectively moved from a "both-and" to a "neither-nor" regime of rights and remedies.

### C.

Like the Supreme Court, this court briefly dallied with constitutional tort litigation. In *Godfrey v. State*, this court adopted a duty-based conception of the Iowa Constitution, held that the due process clause of the Iowa Constitution was self-executing, and held that the plaintiff could pursue a constitutional tort claim for alleged violations of the same. 898 N.W.2d at 871–72. This court quickly corrected course in *Burnett* and overruled *Godfrey*, holding that there is no

"standalone cause of action for money damages under the Iowa Constitution." *Burnett*, 990 N.W.2d at 307.

I joined the *Burnett* opinion because the duty-based constitutional tort regime created in *Godfrey* was inconsistent with Iowa constitutional law. *Godfrey* was unprecedented in Iowa. In the 160 years between the adoption of the Iowa Constitution and *Godfrey,* this court had never recognized a constitutional tort claim. The primary flaw in *Godfrey* was that the *Godfrey* court ignored the difference between a nullification-based and a duty-based conception of the constitution. The Iowa Constitution explicitly provides that it is a nullification-based document. *See* Iowa Const. art. XII, § 1. *Godfrey* further ignored that the framers of the state constitution had explicitly considered and rejected a tort-based theory of constitutional law and adopted a nullification-based theory of constitutional law. *See Burnett,* 990 N.W.2d at 296 (discussing the state constitutional convention); *see also* Recent Case, 137 Harv. L. Rev. at 1032–33 (summarizing the debates at the state convention).

An additional problem with *Godfrey* was that it was unworkable and impractical. *Godfrey* created the potential for liability for the government and its officials limited only by the judicial imagination. In the few short years between *Godfrey* and *Burnett,* our courts were inundated with a wide variety of conceptually problematic and ill-defined constitutional torts, which were appropriately rejected. *See, e.g., Norris v. Paulson,* No. 23–0217, 2024 WL 4469203, at *3 (Iowa Oct. 11, 2024) (per curiam); *Venckus v. City of Iowa City,* 990 N.W.2d 800, 803 (Iowa 2023); *White v. Harkrider,* 990 N.W.2d 647, 652 (Iowa 2023); *Carter v. State,* No. 21–0909, 2023 WL 3397451, at *1 (Iowa May 12, 2023) (per curiam); *Lennette,* 975 N.W.2d at 392–97; *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 533 (Iowa 2019).

In contrast, the nullification framework of constitutional law does not share this defect. The common law gave rise to constitutional rights. What we now recognize as constitutional rights to life, liberty, and property arose out of centuries of litigation. Case by case, over an extended period of time, those cases created doctrines, expectations, entitlements, and, ultimately, rights to be free from certain injuries and to receive compensation for certain injuries. The common law causes of action giving rise to individual rights were and are well-defined and easily applied. No judicial imagination is needed to hold government officials to account.

Take the claim at issue in this case. The Iowa Constitution protects the right to liberty—the common law right to locomotion, to be free from unlawful bodily restraint, and to be free from false imprisonment. *See* Iowa Const. art. I, § 1. Claims for false imprisonment for violation of that right have been asserted against government officials without any great controversy or difficulty for centuries. And they are still quite common today. *See generally* R.L.M., *Liability of Jailer for False Imprisonment*, 46 A.L.R. 806 (1927), Westlaw (database updated June 2023) (discussing cases); G.R.B., *Liability of Officer for Exemplary or Punitive Damages in Action for False Imprisonment*, 49 A.L.R. 1386 (1927), Westlaw (database updated April 2021) (discussing cases).

The concurrence's contention that a claim for false imprisonment is unknowable, unworkable, or impractical thus rings hollow. The elements of such a claim are straightforward. *See, e.g., McClain*, 223 N.E.3d at 365 (stating that the elements of a false imprisonment or over-detention claim are "(1) the expiration of a lawful term of confinement, (2) intentional confinement after the expiration, and (3) knowledge that the privilege initially justifying confinement no longer exists"). I am unsure why the concurrence believes it would be so

difficult to administer a state common law tort suit since it is done all over the state by district court judges every single day.

### D.

This court was correct in *Burnett* to overrule the duty-based constitutional tort regime established in *Godfrey,* but today's majority is profoundly wrong to disregard the nullification-based common law constitutional regime and deny Sikora the right to pursue relief for an alleged deprivation of his liberty of movement:

> Of what avail are written constitutions, whose bills of right, for the security of individual liberty, have been written too often with the blood of martyrs shed upon the battle-field and the scaffold, if their limitations and restraints upon power may be overpassed with impunity by the very agencies created and appointed to guard, defend, and enforce them; and that, too, with the sacred authority of law, not only compelling obedience, but entitled to respect? And how else can these principles of individual liberty and right be maintained, if, when violated, the judicial tribunals are forbidden to visit penalties upon individual offenders, who are the instruments of wrong, whenever they interpose the shield of the state? The doctrine is not to be tolerated. The whole frame and scheme of the political institutions of this country, state and federal, protest against it. Their continued existence is not compatible with it. It is the doctrine of absolutism, pure, simple, and naked . . . .

*Poindexter,* 114 U.S. at 291.

### VI.

Our state flag proclaims, "Our liberties we prize and our rights we will maintain." "The very core of liberty secured by our Anglo–Saxon system of separated powers has been freedom from indefinite imprisonment at the will of the Executive." *Hamdi v. Rumsfeld,* 542 U.S. 507, 554–55 (2004) (Scalia, J., dissenting). The majority and concurrence reject the very core of liberty at the heart of our state constitutional order and hold that wrongful imprisonment and over-detention is de facto and de jure lawful in this state when done by state

officials. That might be celebrated in jurisdictions with Potemkin constitutions where the government has no honest regard for the liberty of its citizens, but it should not be celebrated here. It is absolutism, pure, simple, and naked. I would adhere to the original law of our constitution and allow Sikora to proceed with his wrongful imprisonment claims against the individual defendants in their individual capacities.

Oxley and McDermott, JJ., join this dissent.

**Oxley, Justice (dissenting).**

I join my dissenting colleagues, both of whom ably explain the historical reasons why a common law false imprisonment claim against a state employee is protected by our constitution, such that the general assembly's attempt to immunize state employees under Iowa Code § 669.14(4) (2022) cannot stand.

In addition to joining each of their scholarly opinions, I offer my simplistic explanation as to why the majority is wrong to blindly rely on *Wagner v. State*, 952 N.W.2d 843 (Iowa 2020), to extend sovereign immunity to state employees. As my dissenting colleagues explain, the doctrine—and whether it extends beyond the state to also immunize its employees—is much more nuanced than the majority recognizes, a fact that the majority is able to ignore with a drive-by citation to an inaccurate statement in *Wagner*.

The best that can be said about *Wagner* is that we quoted a statement from another case, not necessary to our holding, without tracing the quoted legal proposition through the cases cited to support it. *Wagner* quoted the following statement from *Dickerson v. Mertz*: "The doctrine of sovereign immunity dictates that a tort claim against the state or an employee acting within the scope of his office or employment with the state must be brought, if at all, pursuant to [the Iowa Tort Claims Act]." *Wagner*, 952 N.W.2d at 856 (quoting *Dickerson v. Mertz*, 547 N.W.2d 208, 213 (Iowa 1996)). *Dickerson* held that two state conservation officers were "statutorily immune from plaintiff's abuse of process and malicious prosecution claims" under Iowa Code sections 669.14(4) and 669.23. *Dickerson*, 547 N.W.2d at 213; *see also* Iowa Code § 669.23 ("Employees of the state are not personally liable for any claim which is exempted under section 669.14."). While we characterized section 669.23 as extending the state's sovereign immunity to

state employees for claims falling under section 669.14, the case involved only statutory issues; the plaintiff did not bring a constitutional challenge to section 669.23. *See id.*

*Dickerson*, in turn, cited three cases to support the proposition that sovereign immunity extended to state employees acting in their official capacities: *Swanger v. State*, 445 N.W.2d 344, 346 (Iowa 1989); *Hansen v. State*, 298 N.W.2d 263, 265 (Iowa 1980); and *Lloyd v. State*, 251 N.W.2d 551, 555 (Iowa 1977). *Dickerson*, 547 N.W.2d at 213. But each of those cases was brought only against the state, not its employees. And none of them say anything about sovereign immunity extending beyond the state or its agencies to its employees. *See Swanger*, 445 N.W.2d at 346 ("Formerly, the doctrine of sovereign or governmental immunity deprived courts of jurisdiction over suits brought against the State sounding in tort." (citing *Hubbard v. State*, 163 N.W.2d 904, 906 (Iowa 1969) ("Prior to March 30, 1965, the effective date of the Iowa Tort Claims Act . . . , our courts lacked jurisdiction over suits brought against the State and its agencies sounding in tort."))); *Hansen*, 298 N.W.2d at 265 ("Prior to the enactment of chapter 25A, tort suits could not be brought against the state because such suits were prohibited by the doctrine of sovereign immunity." (citing *Lloyd*, 251 N.W.2d at 555 )); *Lloyd*, 251 N.W.2d at 555 ("Prior to enactment of chapter 25A, The Code, known as the 'Iowa Tort Claims Act,' which became effective March 30, 1965, our courts lacked jurisdiction over suits brought against the state or its agencies sounding in tort."); *id.* (discussing *Montandon v. Hargrave Const. Co.*, 130 N.W.2d 659, 661 (Iowa 1964) ("The [highway] commission is an arm of the State, and unless legislative consent appears is not subject to suit in this case.")).

In short, *Wagner* does not support the foregone conclusion that the majority attributes to it—namely, that common law sovereign immunity extends beyond the state's own liability for the acts of its agents or employees, *cf. Graham v. Worthington*, 146 N.W.2d 626, 639–41 (Iowa 1966) (rejecting constitutional challenge to the Iowa Tort Claims Act as a violation of article VII, section 1 of the Iowa Constitution, which precludes the state from becoming responsible for the debts of an individual, on the basis that the state has its own liability for torts committed by its agents where, "under common law, the master is liable for the tort of his agent by operation of law")—to also immunize its agents and employees from personal liability. And having properly set it aside, a review of the historical understanding of sovereign immunity as so cogently described by my dissenting colleagues reveals the majority's error in relying on sovereign immunity to protect the director of the Iowa Department of Corrections from Sikora's damages action for false imprisonment. I respectfully dissent.

McDonald and McDermott, JJ., join this dissent.

**McDermott, Justice (dissenting).**

When state officials falsely imprison someone, does the law provide the victim with a remedy? The majority today says no. Its conclusion is both frightening and, as a legal matter, wrong.

The harm for which Eugene Sikora seeks a remedy in this case—his continued incarceration in a state prison for months beyond the end of his sentence—presents an obvious deprivation of liberty. The right to pursue a common law cause of action for false imprisonment existed when the Iowa Constitution was enacted. Such a right protects against arbitrary action by government officials by providing a remedy when an official abridges a person's liberty interest. Because the right was part of the background law at the time of the framing and was incorporated into our constitution to preserve a fundamental right, the legislature lacks the power to eliminate the right entirely. I thus respectfully dissent.

I.

Sikora pleaded guilty to several crimes and, after his sentencing, entered prison on May 4, 2017. He was supposed to be released on October 24, 2018. But he was not released until March 19, 2019—almost five months after his ordained release date.

He sued the State of Iowa and the director of the Iowa Department of Corrections in her personal and official capacities. After the defendants filed a motion to dismiss the petition, Sikora filed a motion to amend his petition to include common law tort claims for false imprisonment and trespass on the case and to add as defendants two other directors of the Iowa Department of Corrections. The district court granted the State's motion to dismiss and denied

Sikora's motion to amend. The district court concluded that Sikora's claims, including his false imprisonment claim, were barred by sovereign immunity and the Iowa Tort Claims Act.

The majority affirms the district court ruling under the same basic reasoning. It first concludes that the doctrine of sovereign immunity applies not only to the state itself but to state officials. The majority then concludes that even if suits for money damages against state officials for wrongful imprisonment were permitted under the common law, the Iowa Tort Claims Act immunizes state officials from such suits.

## II.

## A.

The historical evidence leaves little doubt that people could sue state officials for money damages during Iowa's framing era. "From the beginning of the nation's history, federal (and state) officials have been subject to common law suits as if they were private individuals, just as English officials were at the time of the Founding." Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the* Bivens *Question*, 161 U. Pa. L. Rev. 509, 531 (2013) [hereinafter Vázquez & Vladeck]. Indeed, the framers of our Federal Constitution were aware that state courts permitted suits against state officials and even considered state courts as a venue where *federal* officials could be held accountable for their misconduct too. *Buchanan v. Barr*, 71 F.4th 1003, 1014–15 (D.C. Cir. 2023) (Walker, J., concurring); *see also* Stephen I. Vladeck, *The Inconsistent Originalism of Judge-Made Remedies Against Federal Officers*, 96 Notre Dame L. Rev. 1869, 1880 (2021) ("As early as 1817, the Supreme Court expressly affirmed the power of *state* courts to award damages against federal officers who had acted unlawfully.").

Common law claims against state officials often were based on two historical forms of trespass referred to as trespass "on the case" and trespass "*vi et armis*" (meaning "by force and arms"). *See* Vázquez & Vladeck, 161 U. Pa. L. Rev. at 538; F.W. Maitland, *Equity Also the Forms of Action at Common Law: Two Courses of Lectures* 362 (A.H. Chaytor & W.J. Whittaker eds., 1910) [hereinafter Maitland, *Equity Also the Forms of Action at Common Law*]. Although sparingly referred to by these names in courts today, during Iowa's framing era, these were the most common tort claims. Maitland, *Equity Also the Forms of Action at Common Law* at 365–66.

The distinction between the two is subtle. Trespass on the case "provided for liability even where 'the wrong complained of [did] not . . . consist of the direct application of unlawful physical force.' " Vázquez & Vladeck, 161 U. Pa. L. Rev. at 538 (alteration and omission in original) (quoting Maitland, *Equity Also the Forms of Action at Common Law* at 360). Trespass *vi et armis* occurred when "the act that does the injury is an act of direct force" performed either willfully or negligently. Maitland, *Equity Also the Forms of Action at Common Law* at 362 (quoting *Holmes v. Mather*, 10 LR Exch. 261 (1875)). Trespass on the case was the foundation for torts such as defamation, libel, and negligence, *see* Vázquez & Vladeck, 161 U. Pa. L. Rev. at 538, while trespass *vi et armis* was the foundation for torts such as assault, battery, and false imprisonment, *see* Maitland, *Equity Also the Forms of Action at Common Law* at 383.

Officials could assert various defenses in response to these claims. But "[t]he fact that the defendant was a government official was relevant to the official's *defense* rather than the *existence* of a cause of action." Vázquez & Vladeck, 161 U. Pa. L. Rev. at 531 (emphases added). For instance, officials could claim a justification defense and argue that they were within the scope of their

authority under the law. *Id.* If an official was within their authority, the defense was successful, but if an official exceeded their authority—including by violating the constitution—then the defense failed. *Id.*

Some officials also had immunity defenses. *See, e.g., Lough v. City of Estherville*, 98 N.W. 308, 310 (Iowa 1904) ("It has always been the law that a public officer who acts either in a judicial or legislative capacity cannot be held to respond in damages on account of any act done by him in his official capacity."). Under the common law, whether an official enjoyed immunity depended on the duty they were exercising. *See* Montgomery H. Throop, *A Treatise on the Law Relating to Public Officers and Sureties in Official Bonds* §§ 736–37, at 699–701 (1892) [hereinafter Throop, *A Treatise on the Law Relating to Public Officers and Sureties in Official Bonds*]. If an official exercised a ministerial duty and injured a person through "malfeasance, misfeasance, or nonfeasance," then the law gave "redress to the injured person by an action for damages." *Id.* § 724, at 688.

Because law enforcement officers' jobs were regulated by statute, carrying out those duties was viewed as ministerial in nature. *Id.* § 754, at 715. If an officer wrongfully detained someone, for instance, the detainee at common law could sue the officer for damages. *Id.* § 754, at 716. The officer, in response, could assert as a defense that they were carrying out a warrant that appeared "fair on its face." *Id.* § 758, at 718–19. If true, the officer could not be held liable. *Id.*

Sovereign immunity was generally not a defense at an official's disposal. "[G]overnment officers have long been held to be suable in their own right, without the government's immunity, meaning that in most cases sovereign immunity recedes into the background." William Baude, *Sovereign Immunity and*

*the Constitutional Text,* 103 Va. L. Rev. 1, 4 (2017) [hereinafter Baude]. At the debates of the Iowa constitutional convention, the delegates discussed sovereign immunity, but notably their discussion was limited to its application to the state itself and not its officials. 1 *The Debates of the Constitutional Convention of the State of Iowa* 409–10 (W. Blair Lord rep., 1857).

B.

Sovereign immunity generally prevents claims for money damages against the state itself. Although the state waived sovereign immunity in the Iowa Tort Claims Act, Iowa Code § 669.4 (2022), it did so in limited fashion. The Act contains a list of exceptions for which the state does not waive sovereign immunity, including as to "[a]ny claim arising out of . . . false imprisonment." *Id.* § 669.14(4). Because the state retained its sovereign immunity for false imprisonment claims, Sikora's false imprisonment claim is barred as against the state itself.

But Sikora named (or sought to name) individual defendants too—three officials with the Iowa Department of Corrections, in their personal and official capacities—that he alleges were responsible for his false imprisonment. The majority states that "state employees acting within the scope of their employment" are also covered by sovereign immunity. And indeed, in a relatively recent case, we said as much. *See Wagner v. State*, 952 N.W.2d 843, 856 (Iowa 2020). Relying on the premise that employees have sovereign immunity protection too, the majority concludes that Sikora's false imprisonment claim against the individual state employees also fails. But our statement in *Wagner v. State* that sovereign immunity applies to claims against state employees was, as both a historical and legal matter, incorrect.

In general, a state is immune from suit unless it consents to be sued. But it's important to understand what is meant by "state" in repeating this maxim. The state itself "can speak and act only by law, [and] whatever it does say and do must be lawful." *Poindexter v. Greenhow*, 114 U.S. 270, 290 (1885). Yet when state *officials* commit misconduct, their acts are "not the word or deed of the state, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name." *Id.* In practice, at common law, an official's jurisdiction had nothing to do with whether the official received immunity. *See* Throop, *A Treatise on the Law Relating to Public Officers and Sureties in Official Bonds* §§ 736–37, at 699–701. Liability instead turned on the type of duty being exercised. *Id.*

Municipalities (political subdivisions such as counties, cities, or other similar entities) perform governmental functions on a localized level. Iowa Code § 670.1(2). But municipal employees and state employees often carry out similar tasks. For instance, although employed by different governmental entities, a state trooper, a county sheriff's deputy, and a city police officer all carry out law enforcement responsibilities, such as detaining and arresting criminal suspects. Similarly, both county sheriffs (at county jails) and state prison officials (at state prisons) are responsible for the custody and control of incarcerated inmates.

The majority suggests that although in some instances plaintiffs could pursue tort claims against *local* government officials, plaintiffs could not pursue tort claims against *state* officials before the Iowa Tort Claims Act waived sovereign immunity. To support this assertion, the majority points to a lack of cases against state officials. But this fails to consider an important fact of our state's history: for a long time, the state itself had relatively few employees. At the time of the founding, law enforcement was almost entirely a municipal

endeavor. *See* Robert Wallace Shea, *History and Administration of the Iowa Bureau of Criminal Investigation*, 34 Iowa J. Hist. & Pol. 262, 262–64 (1936) [hereinafter Shea]. It took more than a half-century before any statewide law enforcement agency emerged. *See id.* at 264. Consider, for example, what are now three well-known state agencies with law-enforcement responsibilities: the Iowa Department of Corrections, the Iowa Department of Natural Resources, and the Iowa Department of Criminal Investigations.

Iowa's prison system began with the territorial legislature's adoption of a criminal code in 1838, which created a need for a penitentiary. *See* John Ely Briggs, *A Penitentiary for Iowa*, 20 Palimpsest 400, 400 (1939). The territorial legislature chose Fort Madison for the territory's first prison in 1839. *Id.* at 401–04. Iowa formed its second prison, the Anamosa State Penitentiary, in 1872. Joyce McKay, *Reforming Prisoners and Prisons: Iowa's State Prisons—The First Hundred Years*, 60 Annals of Iowa 139, 139–40 (2001) [hereinafter McKay]. By the 1890s, there were thirteen state carceral facilities. *Id.* at 158. Although created by the state, these institutions were each separately governed by their own board of trustees under the direction of the Governor. *Id.* Managing over a dozen independent boards eventually became cumbersome, so in 1898, the legislature for the first time centralized Iowa's prison administration under one agency. *Id.*

The lack of reported cases against *state* prison officials early in our history is because there *were no* state prison officials early in our history. But our reported cases do provide evidence that the only prison officials then existing— *local* ones—were subject to civil lawsuits. *See Hutchinson v. Sangster*, 4 Greene 340, 341–42 (Iowa 1854) (involving a false imprisonment claim against a sheriff at a local jail).

It would be even longer before Iowa formed its first centralized state criminal investigation organization. *See* Shea, 34 Iowa J. Hist. & Pol. at 275; *see also* Walter E. Kaloupek, *The History and Administration of the Iowa Highway Safety Patrol*, 36 Iowa J. Hist. & Pol. 339, 346 (1938). In our state's first half-century or so, local governments handled their own law enforcement. McKay, 60 Annals of Iowa at 141. There was no need for a statewide law enforcement agency because most legal issues were confined to a municipality's borders. *See* League of Women Voters of Iowa, *Study of the Constitution of Iowa: The Executive Branch of Iowa Government* 10 (1960).

But in the early 1900s, the eastern river cities were beginning to become lawless, often because of local corruption. Shea, 34 Iowa J. Hist. & Pol. at 264. The attorney general's office started to campaign for a statewide, centralized police force under the attorney general's authority. *Id.* These efforts failed for several years, but in 1915, the legislature struck a compromise when it "empowered the Governor to appoint not more than four State law-enforcing agents who, under the direction of the Governor, were 'to aid in the capture, detention, arrest and prosecution' of criminals." *Id.* at 268.

Although the legislature gave the power to the Governor, the Governor allowed the attorney general (then a gubernatorial appointee) to direct these agents. *Id.* The agents were initially tasked with rooting out the corruption in the river cities, but eventually that mission expanded to major crime investigations elsewhere. *Id.* at 273. Jurisdiction with local law enforcement was concurrent, but if the attorney general believed that local law enforcement was on the take, he would order his agents to investigate local crime independently. *See id.* These investigations eventually bled from major crimes into traditionally local

investigations into even petty crimes, such as vagrancy and disorderly conduct. *Id.*

The legislature's move to create these agents was a success, and in 1921—some seventy-five years after Iowa became a state—the legislature officially organized them into the "Bureau of Criminal Investigation." *Id.* at 275. With time, the organization grew into what we know today as Iowa's Division of Criminal Investigations. *See* Press Release, Iowa Dep't of Pub. Safety, *Division of Criminal Investigation Marks 100th Anniversary with Commemorative Event at Iowa Statehouse* (Apr. 8, 2021), https://dps.iowa.gov/press-release/2021-04-08/division-criminal-investigation-marks-100th-anniversary-commemorative-event-iowa-statehouse [https://perma.cc/AA6E-K2QA].

Again, the lack of reported cases against *state* law enforcement officials early in our history is because there *were no* state law enforcement officials early in our history. Our reported cases do, however, provide evidence that local law enforcement officials could be sued in civil actions. *See Stewart v. Feeley*, 92 N.W. 670, 671–72 (Iowa 1902) (false imprisonment claim against a city police officer).

As a final example, Iowa's conservation law enforcement authority originated in 1874, when the legislature created a position called the "state fish commissioner" and placed the commissioner in charge of enforcing state laws related to fish and wildlife. 1874 Iowa Acts ch. 50, § 1 (codified at Iowa Code tit. XI, ch. 3, § 1 (McClain ed. 1880)). In 1897, this leader of conservation law enforcement (by then called the "fish and game warden") was given the power to deputize as many people as he wanted. Iowa Code § 2562 (1897). But this group remained independent and did not fall under what we would think of today as a state agency.

In 1923, the legislature created the board of conservation to manage the newly created state park system. 1923 Iowa Acts ch. 33, §§ 2, 4 (codified at Iowa Code §§ 1795, 1799 (1924)). For the next decade, the board and park system operated independently from law enforcement. But in 1935, the legislature consolidated the state parks with conservation law enforcement. 1935 Iowa Acts ch. 13, §§ 13, 34 (codified at Iowa Code §§ 1703.8 (1939)). It also placed the leader of conservation law enforcement in charge of this consolidated group. *Id.*

Again, the lack of reported cases against *state* conservation officials early in our history is because there *were no* state conservation officials to sue. But our reported cases do provide evidence that once state conservation officials were created, they could be sued in civil actions. *See Coleman v. Tierney*, 165 N.W. 41, 41–42 (Iowa 1917) (false imprisonment claim against a conservation law enforcement officer).

In short, many of our state administrative agencies did not come into being until many decades after Iowa achieved statehood. Cases involving civil suits against local officials from Iowa's founding era show that there was no immunity for government officials generally. Any claim that state officials have always possessed sovereign immunity from civil suits collides with robust historical evidence showing that people unquestionably could sue local officials fulfilling identical duties as their state counterparts today.

Throughout Iowa's founding era, as the following cases show, government officials could be sued for monetary damages; although these officials had multiple potential defenses available, sovereign immunity was generally not one of them:

- *Deforest v. Swan*, 4 Greene 357 (Iowa 1854). The Johnson County sheriff was sued for trespass after he illegally seized the plaintiff's

property. *Id.* at 357. The jury ruled in favor of the plaintiff, and the Iowa Supreme Court upheld the judgment. *Id.* at 357–58.

- *Hutchinson v. Sangster*, 4 Greene 340 (Iowa 1854). An Iowa City marshal was sued for false imprisonment after he arrested the plaintiff for public intoxication. *Id.* at 340–32. The jury ruled in favor of the plaintiff and awarded him $5 in damages, but the Iowa Supreme Court reversed because of a procedural error during trial. *Id.* at 341, 343.

- *Stewart v. Feeley*, 92 N.W. 670 (Iowa 1902). A Burlington city officer was sued for false imprisonment after he arrested the plaintiff for an alleged city ordinance violation. *Id.* at 671. The jury found for the defendant, but the Iowa Supreme Court reversed, holding that the district court failed to properly instruct the jury as to the defendant's justification defense. *Id.* at 671–72.

- *McClurg v. Brenton*, 98 N.W. 881 (Iowa 1904). The mayor of Des Moines, the Des Moines police chief, and the captain of the Des Moines night force were sued for monetary damages after they barged into the plaintiff's house to search for evidence of a crime. *Id.* at 881–82. The jury ruled in the plaintiff's favor, and the Iowa Supreme Court affirmed the verdict. *Id.* at 881, 883.

- *Coleman v. Tierney*, 165 N.W. 41 (Iowa 1917). A deputy game warden was sued for false arrest and false imprisonment after he arrested the plaintiff without a warrant. *Id.* at 41–42. The jury ruled for the plaintiff and awarded him $175, but the Iowa Supreme Court reversed based on sufficiency-of-the-evidence issues. *Id.*

Beyond suits against law enforcement officials, several early cases also offer evidence of suits against "judges of elections" (essentially, election officials)

for violating statutory voting procedures, even though our election statutes did not provide for a cause of action. *See Lane v. Mitchell*, 133 N.W. 381, 382–83 (Iowa 1911) (holding that a judge of elections can be sued for violating a statutory voting procedure); *Long v. Long*, 10 N.W. 875, 876 (Iowa 1881) (holding, in part, that it was proper for the court to instruct the jury that it could award damages if it found a violation of the statutory voting procedure); *Edmonds v. Banbury*, 28 Iowa 267, 273 (1869) (holding that the judges of elections had a valid defense to the suit, but not that the plaintiff lacked the ability to sue in the first place). Although many of these cases were not successful, it was not because the plaintiffs lacked the ability to sue officials.

Sovereign immunity likewise served as no impediment in many early federal court cases involving claims against government officials for money damages. *See* James E. Pfander & Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1918 (2010) (stating that during the antebellum era, "the role of sovereign immunity was quite limited" and that "one who suffered a loss at the hands of a government actor was entitled to sue the officer for damages in state or federal court and recover an award"). A small sampling of cases illuminates this fact. *See, e.g., Chaffin v. Taylor*, 114 U.S. 309, 309–10 (1885) (trespass claim against a county treasurer collecting taxes on behalf of the state); *Walker v. Crane*, 29 F. Cas. 13, 20–21 (C.C.D. Vt. 1865) (No. 17,067) (assault, battery, and false imprisonment claims against a provost marshal); *Fiedler v. Maxwell*, 8 F. Cas. 1194, 1194–95 (C.C.S.D.N.Y. 1853) (No. 4,760) (trespass claim against a United States official for taking property based on a faulty lien); *Brown v. Robertson*, 1 Hay. & Haz. 134 (C.C.D.C. 1843) (false imprisonment claim against a Washington D.C. police officer); *Johnson v. Tompkins*, 13 F. Cas.

840, 843–44 (C.C.E.D. Pa. 1833) (No. 7,416) (false imprisonment claim against a justice of the peace); *Wells v. Hubbard*, 2 D.C. (2 Cranch) 292 (C.C. 1822) (trespass claim against a constable for taking property based on a faulty warrant); *Swann v. Bowie*, 2 D.C. (2 Cranch) 221 (C.C. 1820) (trespass claim against a constable for killing the plaintiff's dog); *Neale v. Minifie*, 2 D.C. (2 Cranch) 16 (C.C. 1810) (false imprisonment claim against a justice of the peace); *Stoyel v. Lawrence*, 23 F. Cas. 210, 210 (C.C.D. Conn. 1807) (No. 13,517) (false imprisonment claim against a sheriff).

The evidence is overwhelming that during Iowa's founding era, people could pursue lawsuits for money damages against government officials in both Iowa and federal courts. The majority's claim to the contrary—that sovereign immunity protects state officials from private causes of action—is fundamentally incompatible with the historical evidence.

### C.

The majority contends that even if Sikora's claims aren't barred by sovereign immunity, the Iowa Tort Claims Act separately bars his false imprisonment claim against state officials. This issue requires some unpacking. It's true that a state, through its police power, generally has the authority to enact laws regulating public health, safety, and welfare. *Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995). And true, the legislature likewise generally has the authority to enact laws modifying common law rights. *See Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 88 (Iowa 2022).

But the police power generally grants a state no authority to abridge an individual right protected under the constitution. The Iowa Constitution guarantees that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. If the constitutional right to liberty

secures anything, it necessarily secures a right against confinement by state officials without legal authority, justification, or consent. "[U]nder the pretence of prescribing a police regulation[,] the State cannot be permitted to encroach upon any of the just rights of the citizen, which the Constitution intended to secure against abridgment." *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 87 (1872) (Field, J., dissenting).

Of course, simply because the constitution protects a person's liberty interest does not necessarily mean that a person has a constitutional right to pursue a civil action for false imprisonment as a remedy. The Iowa Constitution does not provide a stand-alone tort claim. *See Burnett v. Smith*, 990 N.W.2d 289, 307 (Iowa 2023). And, as the majority notes, the Iowa Tort Claims Act abolishes the common law cause of action against both the state itself and all state officials for false imprisonment. *See* Iowa Code §§ 669.14(4), .23 (2022).

But a right to pursue a cause of action need not be directly expressed in the constitution's text for such a right to exist. The framers understood that "bills of rights were *declaratory* documents reaffirming those positive rights *already* known to be fundamental." Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 Geo. J.L. & Pub. Pol'y 569, 577 (2017). These lists of rights were not exhaustive. The constitution also protected a variety of individual rights unexpressed in the constitution's text. *Id.* at 576. In fact, many of the framers "thought that fundamental positive rights were identifiable by looking to custom, without any need for constitutional enumeration." *Id.* Both Sir Edward Coke and Sir Matthew Hale—prominent English jurists who significantly influenced the framers of the United States Constitution—advocated for a system of government where rights were defined by custom. Michael W. McConnell, *Tradition and Constitutionalism Before the Constitution*, 1998 U. Ill. L. Rev. 173, 176 (1998).

These rights are part of a body of law sometimes referred to as "general law." *See* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1194 (2024) [hereinafter Baude, Campbell & Sachs]. General law refers to certain fundamental rights and legal principles that were understood and applied through unwritten law that generally operated throughout the states. *Id.* "In the words of Chief Justice Marshall, this body of law included 'those general principles and those general usages which are to be found not in the legislative acts of any particular State, but in that generally recognised and long established law, which forms the substratum of the laws of every state.'" *Id.* (quoting *United States v. Burr*, 25 F. Cas. 187, 188 (C.C.D. Va. 1807) (No. 14,694)).

Core general law rights are often referenced in shorthand as "life, liberty, and property," and "were rights that individuals were understood to have retained upon leaving the proverbial state of nature through a social contract." *Id.* at 1196; *see also* Jud Campbell, *Fundamental Rights at the American Founding*, *in* 4 *The Cambridge History of Rights: The Eighteenth and Nineteenth Centuries* 183 (Dan Edelstein & Jennifer Pitts eds., 2025) (stating that "[t]hese rights comprised all manner of human liberty" and "were not the sort of thing that needed to be, or even could be, specified in long lists").

Although a "liberty" interest is provided in the text of article I, section 9 of the Iowa Constitution, the contours of a person's right to liberty—and specifically, the right to be free from false imprisonment—isn't directly stated. But we find in "constitutional backdrops"—referring to "rules of law that aren't derivable from the Constitution's text, but instead are left unaltered by the text, and in fact are protected by the text from various kinds of legal change"—how to apply and preserve the right. Stephen E. Sachs, *Constitutional Backdrops*, 80

Geo. Wash. L. Rev. 1813, 1816 (2012) [hereinafter Sachs]. Because the right to liberty lacks specificity, we look to founding-era protections to "determine[] how a particular legal system might give [core rights] a more precise effect." Baude, Campbell & Sachs, 76 Stan. L. Rev. at 1197. The right to a remedy for an abridgment of one's liberty interest by false imprisonment is a backdrop right "baked into the constitutional cake." *State v. Short,* 851 N.W.2d 474, 487 (Iowa 2014).

States may regulate any general law right, but this regulatory power is limited. Baude, Campbell & Sachs, 76 Stan. L. Rev. at 1197–98. A state regulation that abridges a fundamental right is unlawful. *Id.* at 1198–99. Courts are called on to enforce the limits of the state's authority to regulate core fundamental rights even when those rights are rooted in the general law. *Id.* at 1199–1200. Although a right or rule might be "absent from the text" of the constitution, the right or rule nonetheless "limits [legislative] power in a way that would take a constitutional amendment to change." Sachs, 80 Geo. Wash. L. Rev. at 1818. In this way, "[a] constitutional backdrop is a common law rule like any other, with one key difference: Some part of the Constitution insulates that rule from being changed." Baude, 103 Va. L. Rev. at 8.

By foreclosing claims against state officials when those officials unlawfully imprison citizens, the state oversteps its regulatory authority. The right to pursue a claim against a state official for false imprisonment was well-established at the time of the founding and is part of the core rights embedded within the law to preserve fundamental constitutional rights. (Indeed, the doctrine of state sovereign immunity itself, which the majority relies on, but which is nowhere mentioned in the constitution's text, arguably derives from a constitutional backdrop as well. *See* Sachs, 80 Geo. Wash. L. Rev. at 1868–72.)

The ability to bring a false imprisonment claim provides both a remedy to victims and promotes deterrence against further abridgements. The majority's dismissal of Sikora's claim leaves him without a remedy despite his having allegedly suffered five months of unlawful confinement. And after today, it is hard to see what disincentive any state prison official would have to unlawfully hold an inmate well beyond his release date.

Despite the majority's suggestion to the contrary, people falsely imprisoned in the manner Sikora alleges lack any other viable remedy. Again, for claims seeking to remedy intentional torts, the Iowa Tort Claims Act creates immunity for the state and extends that immunity to its employees when they act in their official capacity. Iowa Code §§ 669.14(4), .23. Permitting intentional tort claims against officials only when acting in their *personal* capacities leaves victims without a remedy in most cases. And in any event, as this case shows, a person's constitutional liberty interest becomes an empty gesture if the state can deprive victims of a remedy by making state officials bulletproof from their *intentional, official* misconduct.

Remedies under federal law fail to fill the void. Claims under 42 U.S.C. § 1983 permit people to sue state officials in federal court in their personal capacities when they have violated "any rights, privileges, or immunities secured by the Constitution and laws." But under federal law, unless plaintiffs can show that the defendant violated a "clearly established" right—one "which a reasonable person would have known"—the defendant is immune. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Whether a statutory or constitutional right is "clearly established" is a high bar— one that doesn't apply to common law claims in state court. *See Doe v. W. Dubuque Cmty. Sch. Dist.*, 20 N.W.3d 798, 804–05 (Iowa 2025). And again, it's

more than a little odd to suggest that victims must pursue a liberty interest protected under the *state* constitution in *federal* court.

The failure to recognize and enforce constitutionally protected rights and remedies perhaps helps explain our court's brief misadventure into recognizing constitution-based tort claims in *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), which we later overruled in *Burnett v. Smith*, 990 N.W.2d 289. As several scholars have observed, "[T]he decline in legal recognition of the general rights of citizenship has corresponded with a rise in the legal recognition of unenumerated constitutional rights." Baude, Campbell & Sachs, 76 Stan. L. Rev. at 1252. In *Burnett*, we criticized the constitution-based tort recognized in *Godfrey* as elusive in nature and scope. *Burnett*, 990 N.W.2d at 304–05.

The nature and scope of common law causes of action, however, are known quantities defined through the lengthy experience of common law adjudications. False imprisonment claims are no exception. They predate our own state constitution. *See, e.g., Hutchinson*, 4 Greene 340 (considering a false imprisonment claim in 1854). We know the elements for such a claim, *see Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982), and how to determine damages for them, *see Sundholm v. City of Bettendorf*, 389 N.W.2d 849, 853 (Iowa 1986) (en banc).

What's more, as a policy matter, experience suggests that the republic will not fall if people are permitted to sue for damages when *state* officials falsely imprison someone. We know this because the Iowa *Municipal* Tort Claims Act—the statute that waives immunity for most tort claims against municipalities and their employees—already permits actions against *local* officials for false imprisonment. *See* Iowa Code § 670.4 (containing no exception for false imprisonment claims against municipal officials). If a local official may be sued

for false imprisonment relating to incarceration in a county jail, it stands to reason that state officials could similarly be subject to suit for identical conduct at a state prison. Whether people have a remedy when they fall victim to being falsely imprisoned through an official's misconduct should not depend on the employer—state or municipal—that signs the official's paycheck.

III.

Although it may be too late in the day to assume that the legislature will repeal the Iowa Tort Claims Act's grant of immunity to state officials for false imprisonment, it is not too late in the day for us to hold the line against state-sanctioned imprisonment without justification and to declare the statute unenforceable here. Sikora has the right to pursue his false imprisonment claim against the prison officials in this case. I would reverse the district court's dismissal and let him pursue it.

McDonald and Oxley, JJ., join this dissent.